**HARRIS TRUST AND SAVINGS BANK, as Executor of the Estate of Mary Ellis, Plaintiff,**

v.

**James ELLIS; Moline Consumers Company, an Illinois corporation; First National Bank of Moline, a national banking association; and Duff and Phelps, Inc., an Illinois corporation, Defendants.**

No. 84 C 5148.

United States District Court, N.D. Illinois, E.D.

May 6, 1985.

---

the estate of Mary Ellis against defendants James Ellis, Moline Consumers Company ("Moline Consumers"), the First National Bank of Moline ("the Bank"), and Duff and Phelps, Inc. ("Duff and Phelps") alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68; the Investment Advisers Act, 15 U.S.C. § 80b–1 *et seq.*; and various state laws.[1] Presently before the Court are motions to dismiss or for summary judgment filed by each of the defendants, as well as a memorandum by defendants questioning the compliance of Harris' counsel with General Rule 39 of the United States District Court for the Northern District of Illinois. For the reasons set forth below, defendants' motions to dismiss and for summary judgment are granted.

### FACTS

This case begins with the death in 1968 of Mary Ellis' husband Oscar. Until he died, Oscar played a substantial role in the management of Moline Consumers, which he had founded with Charles Loptien. Oscar's estate included real estate, 6,350 shares of Moline Consumers common stock, and other personal property. Under his will, Oscar's estate was divided into a marital trust for the benefit of his wife Mary and a residuary trust for the benefit of Oscar's children, James and Bette. The will named the Bank as the executor of the estate and trustee of the two trusts.

The marital and residuary trusts were funded in June of 1981. Of the 6,350 shares of Moline Consumers stock, 3,263 were distributed to the marital trust and 3,087 were distributed to the residuary trust.[2] On June 18, 1981, the Bank (as trustee of the marital trust) agreed to sell

Michael K. Murtaugh, Thomas Doyle, Robert C. Boling, Baker & McKenzie, Chicago, Ill., for plaintiff.

Brian J. Redding, Chadwell & Kayser, Roger Pascal, Schiff, Hardin & Waite, Joseph E. Coughlin, Shelly L. Rice, Lord, Bissell & Brook, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Harris Trust and Savings Bank ("Harris") brings this action as executor of

---

1. Jurisdiction is asserted under 28 U.S.C. § 1331 and principles of pendent jurisdiction.

2. It was determined in 1983 that an additional 423 shares should have been distributed to the marital trust. Thus, the corrected allocation of stock was 3,686 shares to the marital trust and 2,664 shares to the residuary trust.

the 3,263 shares to Moline Consumers for $884,273.00, or $271.00 each, conditioned upon approval by the Circuit Court for Rock Island County. The Circuit Court gave its approval on September 15, 1981, and the sale was consummated. This 1981 transaction is the primary focus of this case.

Briefly summarized, the amended complaint alleges that the 1981 sale resulted from a complex plan by defendant James Ellis to concentrate control of Moline Consumers in his hands. Harris claims that during the administration of Oscar's estate, James was a Moline Consumers shareholder, was the president of Moline Consumers, was a director of the Bank, controlled substantial deposits at the Bank, and held a beneficial interest in the Moline Consumers stock allocated to the residuary trust. James allegedly used his influence in these positions improperly to exclude other shareholders from control of Moline Consumers. As a result of his and the other defendants' machinations, Harris asserts that James was able to arrange the sale of Moline Consumers stock from the marital trust to the company for $271.00 per share when the fair market value of the shares actually exceeded $1,400.00 each.

Defendants argue that Harris is precluded by the doctrines of res judicata and collateral estoppel from relitigating the material factual allegations of the amended complaint, because they have been resolved already by a long series of final orders of Illinois courts. Defendants also raise specific objections applicable to each of the amended complaint's counts. We turn now to a discussion of the objections relating to the different federal law counts.[3]

## SECURITIES EXCHANGE ACT OF 1934

■ In Counts I, II and XII, Harris alleges that the defendants violated, or aided and abetted the violation of, Section 10(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. 240.10b–5.[4] Defendants argue that these counts must fail as a matter of law because Mary Ellis was not sufficiently involved in any investment decisions for there to be fraud "in connection with" the sale of the Moline Consumers stock allocated to the marital trust. We agree.

In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court made it clear that not all breaches of fiduciary duty involving a securities transaction constitute a violation of the federal securities laws. Rather, the Court stated that a claim of fraud and fiduciary breach would state a cause of action under Rule 10b–5 only if the conduct alleged could be fairly viewed as "manipulative or deceptive" within the meaning of section 10(b). *Id.* at 472–74, 97 S.Ct. at 1300–1301.

The Seventh Circuit applied the holding of *Santa Fe* to the situation presented by this case, where a trustee allegedly breached its fiduciary duty in connection with a sale of securities owned by the trust, in *O'Brien v. Continental Illinois National Bank and Trust Company of Chicago,* 593 F.2d 54 (7th Cir.1979). The trustee in *O'Brien* was vested with sole discretionary power to purchase and sell securities; the plaintiff-beneficiaries, on the other hand, "were not entitled to receive notice of a contemplated purchase or sale, to participate in the investment decision, or to veto that decision when they learned of it." *Id.* at 58. Their sole recourse against an unsatisfactory securities transaction was to terminate the trust agreement or sue for breach of fiduciary duty.

While not ruling categorically that trust beneficiaries could never be deemed purchasers or sellers of securities, the Seventh Circuit refused to recognize a cause of

---

**3.** Because of our disposition of this case we need not reach defendants' res judicata and collateral estoppel arguments, which apply to both the federal and state law claims.

**4.** These provisions prohibit the use of manipulative or deceptive practices in connection with the purchase or sale of any security.

action under section 10(b) or Rule 10b–5 in *O'Brien. Id.* at 59. The Court of Appeals centered its analysis on whether the plaintiffs had been "denied information that would or might have been useful to them in deciding whether to purchase or sell securities which they actually did purchase or sell." *Id.* at 60. Because the plaintiffs had no voice in the investment decision, any nondisclosure related only to whether they should terminate the trust agreement or perhaps initiate some action against the trustee. The Seventh Circuit held that section 10(b) did not apply to that situation: "Information material to the decision whether to terminate the trust or agency agreements is outside the penumbra of § 10(b) as defined in *Santa Fe Industries, Inc. v. Green,* because such a termination is not a security transaction." *Id.* In summary, the Court stated

> When the trustee or agent alone makes the investment decision to purchase or sell, his failure to disclose information about the purchase or sale to the beneficiary or agent [sic] does not satisfy the "in connection with" requirement of § 10(b). The enforcement of fiduciary and contractual duties owed by a trustee or agent to the beneficiary or principal is the concern of state law, not the federal securities laws.

*Id.* at 63.

Defendants argue that *O'Brien* is indistinguishable from this case. Oscar Ellis' will granted the Bank, as trustee of the marital trust, full power to retain or sell any of the trust property.[5] The Bank's power to sell Moline Consumers stock was limited only in that James Ellis was designated an adviser with veto power over proposed sales. Mary Ellis had no role in any "matters concerning corporate stocks"— she was to "be adviser as to all *other* matters" (emphasis added).[6] Thus, defendants argue, Mary Ellis stood in the same position as the *O'Brien* plaintiffs, with no

investment decisions to make in connection with any security transaction.

Defendants suggest that Mary's remoteness from the actual securities sale is demonstrated further in Harris' amended complaint, which "virtually parrots the language deemed insufficient to state a cause of action in *O'Brien* ":

> 61. Mary Ellis and those acting in her interest relied upon the misleading and deceptive conduct, misrepresentations, and omissions of material fact, detailed above, in permitting sale of her shares, in foregoing action to alter the management of the trust and its assets, and in allowing the grossly inadequate funding of her trust and sale of her shares.

Defendants claim that the assertion that their allegedly fraudulent conduct might have led Mary Ellis to refrain from interfering in the administration of her trust or altering its management does not plead any closer a connection with a securities sale than was present in *O'Brien.* Thus, they argue that the securities claims must be dismissed.

Harris argues that this case is not governed by *O'Brien* but is actually more analogous to a recent Seventh Circuit case, *Norris v. Wirtz,* 719 F.2d 256 (7th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984). Indeed, many of the facts in *Norris* are quite similar to the present case. Plaintiff Norris was a beneficiary of a trust created from her father's estate. Defendant Wirtz was an executor and trustee, and he was charged with self-dealing by arranging securities sales from the estate to his closely held corporations. However, *Norris* differs from this case in one crucial way: plaintiff Norris' prior approval of the securities sales was required under the will, and the defendants accordingly sought and secured such approval. *Id.* at 260. As explained

---

5. This delegation of power is made in Section Four, Paragraph C(1) and (2) of the will.

6. Section IV, Paragraph E of Oscar's will delineates the advisory roles to be served by James and Mary Ellis quite clearly: "My son James O.

Ellis shall be adviser as to all matters concerning corporate stocks or any sale or acquisition thereof. My wife shall be adviser as to all other matters."

above, Oscar Ellis' will provided for approval only by *James* Ellis.

Harris asserts that there is a material factual dispute concerning Mary Ellis' control over the sale of Moline Consumers stock. We disagree. The will provisions make it abundantly clear that, unlike the *Norris* plaintiff, Mary Ellis had absolutely no say in the stock investment decisions. Any right she had to partially terminate the marital trust by selectively withdrawing assets is akin to the *O'Brien* plaintiffs' right to completely terminate the trust. Such a self-help remedy does not make the beneficiary a participant in the trustee's investment decisions. *O'Brien*, 593 F.2d at 60.

Harris' other arguments regarding this issue merit little discussion. Neither the tax code nor any federal banking regulations changed the will and trust provisions so that Mary Ellis made any investment decisions.[7] State common law certainly imposed fiduciary duties on at least some of the defendants. But the fact that there might have been a breach of fiduciary duty does nothing to create a federal securities claim. *O'Brien*, 593 F.2d at 60–61. Finally, regardless of the Bank's consistency in arguing how much control *it* had over the investment decisions regarding Moline Consumers stock, it has never contended that Mary Ellis had any authority under the will in connection with the sale of stock. We find that she in fact had no such authority and thus cannot complain of any fraud "in connection with" any investment decision or securities transaction. Accordingly, defendants must be granted summary judgment on Counts I, II and XII.

## RICO

Harris charges in Counts III, IV and V that James Ellis, Moline Consumers and the Bank have violated the civil RICO statute. In particular, Harris alleges violations of 18 U.S.C. § 1962(b) and (c). Section 1962(b) makes it unlawful for any person to maintain or acquire an interest, through a "pattern of racketeering activity", in an enterprise engaged in or whose activities affect interstate commerce; section 1962(c) prohibits a person from conducting the affairs of an enterprise that is engaged in, or whose activities affect, interstate commerce through a "pattern of racketeering activity." A "pattern of racketeering activity" is defined in section 1961 as at least two occurrences within ten years of any of several predicate offenses, including mail and wire fraud, bribery, and fraud in the sale of securities.

The amended complaint mentions three types of predicate offenses: mail fraud, wire fraud, and fraud in the sale of securities. As explained in the previous section, Harris has failed to state a claim for any federal securities laws violation. Therefore, Harris must have properly alleged at least two instances of mail or wire fraud which constitute a pattern of racketeering activity.

Defendants argue first that the wire fraud allegations are insufficient jurisdictionally because they lack any reference to an *interstate* wire transmission. This objection is well taken. The wire fraud statute, 18 U.S.C. § 1343, requires that there be a scheme to defraud and an interstate wire communication made in furtherance of the scheme. *E.g., United States v. Freeman*, 524 F.2d 337, 339 (7th Cir.1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The amended complaint fails to allege any use of interstate wires, and given the Illinois residence of all the parties it would not be reasonable to infer that any such use occurred.[8] Thus, Harris' wire fraud allegations are deficient.

Defendants also attack the sufficiency of Harris' mail fraud allegations.

---

7. The one old tax case cited by Harris in support of its argument is inapposite.

8. Harris' only response regarding interstate commerce relates to the general RICO requirement under section 1962 that the enterprise either engage in or pursue activities affecting interstate commerce. This requirement is distinct from the issue raised by defendants, the interstate wire transmission needed to violate section 1343.

Federal Rule of Civil Procedure 9(b), which requires that in all averments of fraud "the circumstances constituting fraud ... shall be stated with particularity", applies as well to fraud allegations in civil RICO complaints. *Haroco, Inc. v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 405 (7th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985). This Court discussed the standards of Rule 9(b) in *D & G Enterprises v. Continental Illinois National Bank and Trust Co. of Chicago,* 574 F.Supp. 263, 267 (N.D.Ill.1983):

> In describing the circumstances constituting fraud, the plaintiff must describe the "time, place and particular contents of the false representations, as well as the identity of the party making the misrepresentation, and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982). Mere conclusory language which asserts fraud, without a description of fraudulent conduct, does not satisfy Rule 9(b). *Lincoln Nat. Bank v. Lampe,* 414 F.Supp. 1270, 1279 (N.D.Ill.1976).

> Where there are allegations of a fraudulent scheme with multiple defendants, the complaint must "inform each defendant of the specific fraudulent acts" which constitute the basis of the action against the particular defendant, *Lincoln,* 414 F.Supp. at 1278.

Defendants claim that Harris' mail fraud allegations do not satisfy these requirements, as they fail completely "to state *who* caused *what* to be placed in the mails *in furtherance* of the alleged scheme to defraud and *when* such mailing was made." This claim is persuasive. Although Harris has responded to this argument by listing several stages in defendants' purported fraudulent scheme which are identified in the amended complaint, none of these add any particular details to the conclusory claim that defendants committed mail fraud.[9] The mere assertion of mail fraud is not enough to support a RICO

claim. Accordingly, Counts III, IV and V must be dismissed.

## INVESTMENT ADVISERS ACT

█ In Count X, Harris seeks damages for alleged violations by Duff and Phelps of section 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6. This count must be dismissed, as there is no such private right of action. In *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable." *Id.* at 24, 100 S.Ct. at 249 (footnote omitted). Harris concedes that *Transamerica* governs this case but argues that it was wrongly decided. Be that as it may, this Court does not sit in review of the Supreme Court. Accordingly, we join the other courts which have followed the *Transamerica* ruling. *E.g., In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation,* 583 F.Supp. 1388, 1418–19 (E.D.Pa.1984); *Richardson v. Shearson/American Express Co., Inc.,* 573 F.Supp. 133, 135 (S.D.N.Y.1983). Count X is dismissed.

## OTHER COUNTS

█ The amended complaint's remaining counts contain various state law claims: breach of fiduciary duty, breach of professional duty, violations of the Illinois Probate Act, and breach of contract. Because all the federal law claims are dismissed, there is no longer any basis for the Court to exercise pendent jurisdiction over the rest of this action. *United Mineworkers of America v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Americana Healthcare Corp. v. Schweiker,* 688 F.2d 1072, 1087 (7th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983). Thus, the state law

---

**9.** Moreover, many of the alleged fraudulent acts involve non-parties to this lawsuit. Harris, of course, lacks standing to complain of any injuries to such persons.

claims in Counts VI-IX, XI, and XIII–XV are also dismissed.

For the foregoing reasons, defendants' motions to dismiss and for summary judgment are granted.[10]  It is so ordered.

---

**10.** The parties have also submitted memoranda discussing whether Harris' counsel complied with General Rule 39 of this Court, which requires attorneys to file with the Court affidavits evidencing ethical conduct and copies of contingent fee agreements. Although it appears that counsel has by now filed everything required by Rule 39, defendants suggest that some (unspecified) sanctions might be in order for the rule violations "which continued for nearly three months until the matter was called to this Court's attention." However, the initial noncompliance with Rule 39 was due at least partially to complications resulting from the Illinois probate court's approval of this litigation before it accepted Harris' contingent fee proposal. Accordingly, we have determined that no sanctions are warranted. Harris, for its part, accuses the Bank's attorneys with "having launched an unfounded assault on the integrity of plaintiff's counsel" and suggests that they "now be held to the accountability imposed by [Fed.R.Civ.P.] Rule 11 on such conduct." Both sides in this quarrel have in fact done a fair job of maligning the other, and we decline to impose Rule 11 sanctions on either party.