**Saad H. GHOUTH, Plaintiff,**

**v.**

**CONTICOMMODITY SERVICES, INC., Conticommodity Services, Limited, Refco, Inc. and Feroz Dinshaw, Defendants.**

**No. 85 C 10005.**

United States District Court,
N.D. Illinois, E.D.

Aug. 6, 1986.

[redacted]

William R. Carney, P. Andrew Fleming, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

William F. Conlon, Thomas K. Cauley, Jr., Richard B. Lapp, Sidley & Austin, James R. Streiker, Matthew F. Kennelly, Cotsirilos & Crowley, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is essentially a commodities fraud suit, alleging violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1961 *et seq.*, as well as various pendent common law claims. The defendants ground motions to dismiss on a number of issues, including an issue of great contention in this district, the meaning of "pattern of racketeering activity" in the wake of *Sedima, S.P.R.L. v. Imrex Co., Inc.,* —— U.S. ——, ——, n. 14, 105 S.Ct. 3275, 3285, n. 14, 87 L.Ed.2d 346 (1985). For the reasons that follow, their motions are granted in part and denied in part.

### A. Facts

We will assume the truth of the well-pleaded allegations of the complaint, but only those allegations. Plaintiff's brief in response to the motions to dismiss is laden with unsupported factual assertions, which we will ignore in assessing the sufficiency of his complaint. *See, e.g., Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 198 (7th Cir.1985). Ironically, defendants rightly complain about plaintiff's reliance on unalleged facts, yet their briefs contain many bald assertions as well. We must ignore those also.

Plaintiff Saad H. Ghouth ("Ghouth") is a Saudi Arabian merchant who earns part of his living by trading commodities and securities in world markets. On September 7, 1982, he was in Los Angeles and met defendant Feroz Dinshaw,[1] a broker for defendant Conticommodity ("Conti"), a Delaware Corporation with offices in, among other places, Los Angeles and Chicago. Ghouth signed a "Customer Agreement," which provided that Conti would act as his broker in buying and selling commodities, futures and options. The Agreement specified that Conti was authorized only "to make transactions for Customer's Account in accordance with customer's oral or written instructions." On September 30, 1982, Ghouth deposited $100,000 in a customer account at Conti's Los Angeles office.

Ghouth alleges that four times between December 1, 1982 and November 1, 1983 "Dinshaw and Conti" stole money from his account by withdrawing money in checks

---

**1.** Ghouth spells defendant Dinshaw's name with a "w," while the man himself uses an "h" at the end, *i.e.,* "Dinshah." Intending no disrespect toward the defendant, we have chosen to adhere to the spelling found in the complaint, since we are reviewing that document.

made payable to him and then forging his endorsement. Specifically, he alleges a withdrawn check and forged endorsement (1) for $600 on December 1, 1982, (2) for $16,775 on March 7, 1983, (3) for $41,200 on March 8, 1983, and (4) for $1,500 on November 1, 1983. The first and fourth checks were payable to Ghouth "c/o Feroz Dinshaw"; the other two were simply payable to Ghouth. Copies of three of the four checks are attached to the complaint. Dinshaw and Conti allegedly converted the money to their own and/or joint use.

Ghouth also alleges that between February 15 and March 3, 1983, Dinshaw made at least 100 unauthorized trades on Ghouth's account. They ultimately debited his account $5,019.00 as commission charges for these unauthorized transactions.

On February 16, 1983, Ghouth authorized Dinshaw to obtain six silver contracts. However, without further authorization from Ghouth, Dinshaw liquidated these contracts a week later, yielding a profit on $37,375.00, but did so in order to cover the losses of another trader. Because of this unauthorized transaction, Ghouth failed to realize $93,125 in profits he would have received because of later favorable movement in the market.

Dinshaw also failed to follow instructions in January 1983 to limit losses to $7,000 on certain contracts. Instead, he let losses add up to $34,782.85.

All through the period from September 1982 to December 1983, Conti did not send Ghouth daily activity statements. Thus, he did not know about the above forgeries, thefts and unauthorized transactions and losses. He first discovered the shenanigans on December 13, 1983, when he was in Los Angeles and reviewed his account statements. He filed this suit just under two years later, on November 27, 1983.

### B. The Claims for Relief

Ghouth's complaint contains fourteen claims. Counts I and II allege commodities fraud under 7 U.S.C. § 6(b) and 7 U.S.C. § 6o(1)(A), respectively. Counts III–V purport to state claims under RICO, 18 U.S.C. §§ 1962(c), 1962(a) and 1962(d), respectively. Counts VI–IX are pendent common law claims in the nature of fraud. There are also claims for breach of fiduciary duty, conversion, breach of contract and negligence. Ghouth alleges that his losses total $186,000, and he requests that amount as compensatory damages, as well as $1 million in punitive damages.

### C. The Motion

#### 1. Defendant Refco

In our summary of the complaint we did not mention defendant Refco. That is because Ghouth hardly mentions it at all. A commodities broker, it concededly played no role in injuring Ghouth. Ghouth joins Refco because "upon information and belief" it became the "successor-in-interest" to Conti in September 1984 pursuant to an "asset purchase agreement." Nothing more is said about the purchase agreement or about Refco.

■ It is not easy for a corporation to be considered a "successor-in-interest" under common law such that it can be held liable for the acts of its predecessor. Generally a purchaser of assets is not liable for the debts or obligations of its predecessor. See, e.g., Goldstein v. Gardner, 444 F.Supp. 581, 583 (N.D.Ill.1978) (Flaum, J.). However, liability may attach if one of four exceptions is met: (1) the purchaser agreed to assume the seller's liability; (2) the sale amounts to a consolidation or merger; (3) the purchaser is merely a continuation of the seller; or (4) the transaction is fraudulent, done to escape liability. Id. Ghouth does not dispute these legal standards.

■ We agree with Refco that the complaint fails to adequately allege that it is Conti's successor-in-interest. Only one fact is alleged, namely, that Refco purchased some of Conti's assets. We do not know how many. There is absolutely no fact from which we can reasonably infer that Refco meets one of the above four exceptions. Because a plaintiff cannot merely plead legal conclusions (even in federal court), but rather must allege a few facts which outline the claim for relief, see,

*e.g., Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984), we must dismiss Refco from this suit.[2]

### 2. *Conti Ltd.*

We also did not specifically mention defendant Conticommodity Services, Ltd. ("Conti Ltd.") in our factual summary. Ghouth only refers to it once in the complaint, alleging that it is a British corporation, with its principal place of business in London, and that it is a wholly-owned subsidiary of Conti. Ghouth then says that he will refer to both Conti's collectively in the complaint as "Conti," and thereafter he makes no distinction between the two. Conti says in its brief that Conti Ltd. trades only in London, and that it did not employ Dinshaw, although in saying so it falls prey to the same disease it diagnosed in Ghouth—making factual assertions without support. While Ghouth says in his brief that evidence from discovery shows Conti Ltd. was involved in his fraud, he does not substantiate his assertion.

■ Looking *only* to the complaint and ignoring Ghouth's unsubstantiated assertions, *see Rodgers* cited above at 2, we find that the complaint simply alleges nothing to implicate Conti Ltd. in addition to Conti. By simply collapsing the two, Ghouth cannot escape his obligation to allege some facts outlining a claim for relief against Conti Ltd. The only thing presently in the complaint which might involve Conti Ltd. is Exhibit C, a check apparently drawn on a London account. But we do not know that that is Conti Ltd.'s account. Facing a complete absence of facts alleged *in the com-*

*plaint* which point to Conti Ltd., we must grant its motion to dismiss it from the case. In light of this result, we need not address its argument that as a foreign entity trading on foreign exchanges, it cannot be held liable under the CEA.

### 3. *Count II—§ 205(a) of the Commodity Futures Trading Commission Act*

Section 205(a) of the CFTCA, 7 U.S.C. § 6o(1)(A), (B), makes it unlawful for certain commodity traders to use the mails or other means of interstate commerce to defraud a client.[3] The section specifically applies to a "commodity trading advisor" ("cta"), a "commodity pool operator" ("cpo") or "associated person" of a cta or a cpo. A cta is defined in 7 U.S.C. § 2 as essentially someone who advises others as to the value or advisability of trading commodity futures, but it exempts "any floor broker or futures commission merchant." Conti argues that it is not a cta, and it has never registered with the Commodity Futures Trading Commission ("CFTC") as a cta; instead, it says it is a "futures commission merchant" and is registered with the CFTC as such. It concludes that it falls within the exemption in the definition of cta found in 7 U.S.C. § 2.

■ Once again Conti is guilty of the crime it accuses Ghouth of, namely, the making of unsubstantiated factual assertions. Without support, its contradictions of the complaint are irrelevant to a motion to dismiss. The complaint reasonably implies that Conti acted as an "advisor" with-

---

**2.** This dismissal shall be without prejudice, however. Ghouth argues in his brief that Conti has refused to produce the full asset purchase agreement, and so he cannot determine whether Refco meets the legal standard for a "successor-in-interest." In case it turns out that Conti is insolvent, and that Refco does meet the first or third exceptions above (the ones that appear relevant) but that Conti has concealed it from Ghouth, Ghouth should be allowed to preserve his rights against Refco.

**3.** That section reads:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

in the meaning of 7 U.S.C. § 2. Paragraph 7 of the contract attached to the complaint contemplates that Conti might give "recommendations ... as to proposed transactions," which clearly suggests that it is a company which advises others "as to the value of commodities or as to the advisability of trading." 7 U.S.C. § 2. Although the complaint does not specifically allege that Ghouth ever received such advice, it does reasonably imply that he did. We cannot say at the pleading stage that Conti was not a cta.

Even if we credit Conti's unsupported contention that it is not registered as a cta and is registered as a futures commission merchant, we would only have a dispute about whether it was, *in fact*, a futures commission merchant. The fact that Conti has not *registered* as a cta is not determinative; what matters is whether Conti actually *acted* as a cta. *See CFTC v. Savage*, 611 F.2d 270, 281–82 (9th Cir.1979).[4] This is clearly a factual issue, which cannot be resolved on our current record.

### 4. *Counts III–V: RICO*

Conti and Dinshaw raise several challenges to the RICO counts, which we shall address in turn. First, Conti argues that Ghouth is trying to hold it vicariously liable for Dinshaw's alleged bad acts, which he cannot do under RICO. Second, Conti challenges Count III, the claim under § 1962(c)[5] of RICO, because it cannot be liable as both a "person" and an "enterprise" under that section. Third, Conti and Dinshaw argue that the RICO and other fraud claims are not pled with the particularity required by Fed.R.Civ.P. 9(b). Finally, they argue that Ghouth has not adequately alleged that they engaged in a "pattern of racketeering activity," as required by §§ 1962(a), (c) and defined in § 1961(5).

a. *Respondeat Superior.* The parties agree RICO does not pin vicarious liability on an "innocent" corporate defendant whose agent violates RICO. *See Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 401 (7th Cir.1984), *aff'd*, —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 23–24 (N.D.Ill. 1982) (Shadur, J.). Conti argues that the complaint points only to unlawful acts of Dinshaw and that Ghouth is necessarily trying hold it liable for Dinshaw's unauthorized, alleged misdeeds. We disagree.

The complaint does not purport to rest on a theory of *respondeat superior.* Rather, it repeatedly alleges that "Dinshaw and Conti" engaged in the allegedly unlawful acts. True, Dinshaw is the only employee identified, and he carried out many of the alleged misdeeds. But that does not necessarily mean that Conti was innocent. Even if Dinshaw was Conti's only actor, the complaint is not necessarily predicated on *respondeat superior.* Conti may well have authorized Dinshaw to so act. Moreover, there are some alleged acts which do not appear to involve Dinshaw and which suggest that Conti was itself directly involved in the schemes. For instance, while two of the four alleged checks were made out to Ghouth "c/o Feroz Dinshaw," the other two do not name Dinshaw. Yet they were drawn on Ghouth's Conti account. Also, Conti allegedly charged Ghouth commission for unauthorized transactions, thereby profiting from the misconduct.[6] Given the liberal standards that govern review of a motion to dismiss, we cannot now rule out the possibility that Conti was in-

---

4. Conti offered no reply to this argument, which appeared in Ghouth's memorandum.

5. That section reads:
   (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

6. While these account charges are not specifically connected in the complaint with any predicate acts, they suggest in general that Conti was involved in general in the misdeeds against Ghouth.

volved in or at least authorized in the alleged fraud.[7]

b. *Enterprise.* The parties also agree that under § 1962(c) a defendant cannot be both a liable "person" and an "enterprise." "Section 1962(c) requires separate entities as the liable person and the enterprise which has its affairs conducted through a pattern of racketeering activity." *Haroco,* 747 F.2d at 400. Count III, the claim under § 1962(c), names "Conti" both as a liable person and the RICO enterprise. We agree with Conti that *Haroco* requires that it be dismissed from Count III.

■ Ghouth cleverly tries to avoid Haroco's grip by arguing in its brief that Conti and Conti Ltd. were *both* "persons" and "enterprises" under § 1962(c), and that each one served as the "enterprise" for the other as "person." That is, Conti was the "enterprise" that Conti Ltd. conducted its affairs through and vice versa. But, the complaint does not allege this. As noted earlier, it collapsed the two into one entity for purposes of the complaint, making no distinction between them. Paragraph 39 simply says that "Conticommodity" was the enterprise. We do not know whether that means one of the Conti's was an enterprise, or both were enterprises, or both combined to form one enterprise. While a parent corporation, as "person," can conduct the affairs of a subsidiary, as "enterprise," or *vice versa, see Haroco,* 747 F.2d at 402–03, that is not what the complaint alleges. It might also be possible (although we need express no opinion on this) for two corporations to form an enterprise as an "association in fact" and *both* be liable "persons" for conducting the enterprise's affairs. *See Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089, 1095 (N.D.Ill.1985) (McGarr, Ch.J.). But, again, that is not what the complaint alleges. Count III of the complaint wholly fails

to give defendants fair notice of the contours of the enterprise. Because the plainest reading of the complaint as now written is that Conti (of America) is the enterprise,[8] it cannot also be liable under § 1962(c). It is therefore dismissed from Count III.

c. *Particularity.* Defendants argue that the three RICO claims, as well as the other fraud claims, fail to satisfy Rule 9(b)'s command that "the circumstances constituting fraud . . . shall be stated [in a complaint] with particularity." We hold that Ghouth has satisfied Rule 9(b).

■ We will focus on the RICO allegations, since much of the analysis will apply to the other fraud claims. Rule 9(b) of course applies to RICO claims based on predicate acts of mail fraud. *See, e.g., Haroco,* 747 F.2d at 405; *Harris Trust and Savings Bank v. Ellis,* 609 F.Supp. 1118, 1123 (N.D.Ill.1985) (Aspen, J.). Mail fraud contains two elements, a scheme to defraud and a mailing which furthers the scheme. *See, e.g., Dunham v. Independence Bank of Chicago,* 629 F.Supp. 983, 986 (N.D.Ill.1986). Rule 9(b) does not command a plaintiff to plead evidence and prove his mail fraud case in the complaint. *Haroco,* 747 F.2d at 405. It complements normal notice pleading under Rule 8(a)(2), listing actions "in which slightly more is needed for notice." *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975); *Dunham,* 629 F.Supp. at 986–87. In detailing the scheme to defraud, the plaintiff must give "a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Tomera,* 511 F.2d at 509. Consistent with *Tomera's* teachings, this Court in the context of allegations of mail fraud has required that a plaintiff sketch out *who* (i.e., which defendant) caused *what* to be mailed *when,* and *how* that mailing

---

7. Of course, we are now doing no more than construing the complaint in the light most favorable to Ghouth, and indulging him all reasonable inferences. We make no factual findings in this opinion. If it turns out that Dinshaw was merely the one bad apple in Conti's barrel, then Conti will probably deserve dismissal later in the case.

8. This follows from our discussion above at 5–6, pointing out that nothing in the complaint identifies how Conti Ltd. is involved in the case. In contrast, Conti itself is plainly implicated under the alleged facts, and it is the most likely, and perhaps only, candidate for "enterprise" in the complaint as now written.

furthered the fraudulent scheme. *Harris*, 609 F.Supp. at 1123.

■ Defendants make much of the fact that Paragraph 41 merely states that Dinshaw and Conti,

> in furtherance of their schemes to defraud plaintiff, used or caused to be used on two or more occasions, in the conduct of the affairs of the Commodities Enterprise, mail delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 and interstate wire communications in violation of 18 U.S.C. § 1343. Among the materials which were sent through the U.S. mails in furtherance of the scheme to defraud plaintiff were the items previously identified as Exhibits B, C, and D, attached hereto [three of the four cancelled, "forged" checks].

Defendants are correct that standing alone this paragraph would not pass muster under Rule 9(b). It does not sketch what the scheme was or describe how the mailings furthered the scheme. But this paragraph must be placed in the context of the entire complaint, not read in isolation. Reading the paragraph in context, we have no hesitation in concluding that the complaint puts defendants on fair notice as to the "who," "how," "when" and "what" of the alleged mail fraud.

In so concluding, we address only the allegations concerning the four alleged forged checks. Only these are identified concerning the mail or wire fraud. While there might have been other mailings in connection with other alleged fraudulent acts, such as the commission charges, because they are not specified they do not satisfy Rule 9(b). But the forged checks are specified and attached to the complaint and provide the necessary details of mail and/or wire fraud violations.

The complaint specifically describes four times that Conti and Dinshaw withdrew money from Ghouth's trading account, forged his endorsement and converted the funds to their own use. Four dates are given. Dinshaw is named on two of the checks; Conti is named on all four. Three of the four cancelled checks are attached to the complaint, and they reveal that:

a. The checks for $600 and $1,500 are drawn on a Chicago account, endorsed by Chicago and Los Angeles banks, and made payable to Dinshaw at a Los Angeles address.

b. The check for $41,200 is payable through a London account.

The complaint also alleges that Dinshaw and Conti converted the funds. Defendants do not argue that these unauthorized withdrawals and forgeries, done while holding onto Ghouth's account statements, do not constitute a "scheme to defraud" under the very broad meaning of that phrase. *See Smith v. Grundy County National Bank*, 635 F.Supp. 1071, 1075–76 (N.D.Ill. 1986) (Aspen, J.). Rather, they argue that the mailings are not adequately specified and that Ghouth does not show how the mailings furthered the scheme. While it is true that Ghouth did not label a specific mailing or detail how it furthered he scheme, these elements are clear and obvious from what is alleged and from the attached checks. It is reasonable to infer that mails and/or wires were necessarily used in the process of clearing checks between Los Angeles and Chicago. It is also obvious how such mailings furthered the "scheme." The alleged forgery and conversion could only be consummated by the check-clearing process. "Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme." *United States v. Wormick*, 709 F.2d 454, 462 (7th Cir.1983). Moreover, a defendant need not mail anything himself. A foreseeable mailing will suffice. *See, e.g., Dunham*, 629 F.Supp. at 988. These mailings were more than incidental to the scheme and were foreseeable. In short, while Ghouth could have been more specific in his allegations of mail fraud, we think that the complaint as a whole sufficiently sketches what the scheme to defraud was, how the mails furthered the scheme, when

it happened and who was involved. Defendants have fair notice of the charges.[9]

d. *Pattern.* We turn finally to the most difficult question presented, one which has caused a split within this district and among the circuits, namely, the meaning of the elusive phrase found in § 1961(5), "pattern of racketeering activity." That section says that such a "pattern" *"requires* at least two acts of racketeering activity" occurring within a ten-year period (emphasis added). "Racketeering activity" is defined in § 1961(1) as any of a number of crimes, called the "predicate acts," including mail fraud, wire fraud and interstate transportation of stolen property, but not including commodities fraud. Ghouth alleges that the four forged checks constitute predicate acts as mail or wire fraud and/or interstate transportation of stolen property. Because there are more than two such alleged acts of racketeering activity, which are related to each other, he asserts that he satisfies the definition of "pattern" found in § 1961(5). We agree with Ghouth's conclusion, but not his reasoning. In resolving this issue, we are not writing on a clean slate.

Under Seventh Circuit cases prevailing before *Sedima, S.P.R.L. v. Imrex Co., Inc.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), *United States v. Starnes,* 644 F.2d 673, 678 (7th Cir.1981), *cert denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 101 (1981), and *United States v. Weatherspoon,* 581 F.2d 595, 601–02 & n. 2 (7th Cir.1978), two or more mailings in furtherance of but one scheme to defraud, giving rise to two indictable acts of mail fraud, satisfy RICO's definition of "pattern" so long as the acts are connected by a common plan, scheme or motive. But *Sedima's* cryptic footnote 14 changed the legal landscape. Pure *dictum,* footnote 14 tells the federal courts to refine the definition of pattern in order to deal with the extraordinary expansion of civil RICO, a statute which has been responsible for drawing many otherwise state law commercial fraud cases into federal court. It reads:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). *See also id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e).

---

**9.** We also hold that the other allegations of fraud, such as common law and commodities fraud, are pled with enough particularity. We also note that with respect to the RICO counts, the allegations concerning the forged checks constitute predicate acts of interstate transportation of stolen property, 18 U.S.C. § 2314. *See United States v. McElroy,* 644 F.2d 274, 275–77 (3d Cir.1981), *aff'd,* 455 U.S. 642, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982).

This language may be useful in interpreting other sections of the Act. *Cf. Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975). The Court raised that issue again at the end of its opinion, commenting that the cancerous growth of civil RICO appears "to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud,[10] and the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" *Id.* at ——, 105 S.Ct. at 3287.[11] In dissent, Justice Powell also argues for a narrowed reading of pattern. —— U.S. at ——, 105 S.Ct. at 3289–90.

In the wake of *Sedima,* the courts have struggled with the pattern definition. The many cases in this district are representative, so we will focus on them. Five judges have interpreted footnote 14 as an edict to narrow the definition of pattern and have accordingly eschewed *Starnes* and *Weatherspoon* in favor of a more restrictive approach. *See Medical Emergency Service Associates v. Foulke,* 633 F.Supp. 156 (N.D.Ill.1986); *Graham v. Slaughter,* 624 F.Supp. 222 (N.D.Ill.1985) (Judge Getzendanner); *Dunham v. Independence Bank of Chicago,* 629 F.Supp. 983 (N.D.Ill.1986); *SJ Advanced Technology & Mfg. Co. v. Junkunc,* 627 F.Supp. 572 (N.D.Ill.1985); *United States v. Yonan,* 622 F.Supp. 721

(N.D.Ill.1985); *Northern Trust Bank/O'Hare v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985) (Judge Shadur); *Neuero Corp. v. Kappler,* No. 85 C 8141 (N.D.Ill. June 12, 1986) (Judge Marshall) [Available on WESTLAW, DCTU database]; *Marks v. Pannell Kerr Forster,* No. 85 C 9399 (N.D. Ill. April 21, 1986) [Available on WESTLAW, DCTU database]; *Agra Gill Duffus, Inc. v. Laurins,* No. 84 C 10420 (N.D.Ill. April 13, 1986) (Judge Hart) [Available on WESTLAW, DCTU database]; *Papai v. Cremosnik,* 635 F.Supp. 1402, (N.D.Ill. 1986) (Judge Moran).[12] Four judges reject a definition any narrower than previously used by *Starnes* and *Weatherspoon. See Brainerd & Bridges v. Weingeroff Enterprise, Inc.,* No. 85 C 0493 (N.D.Ill. July 21, 1986) (Judge Grady) [Available on WESTLAW, DCTU database]; *Haroco v. American National Bank & Trust Co. of Chicago,* No. 83 C 1618 (N.D.Ill. July 7, 1986) (Judge Decker) [Available on WESTLAW, DCTU database]; *Aetna Casualty & Surety Co. of Illinois v. Levy,* No. 83 C 3566 (N.D.Ill. Nov. 7, 1985) (Judge Rovner) [Available on WESTLAW, DCTU database]; *Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494 (N.D.Ill.1985) (Judge Bua).[13] Judge McGarr's opinion in *Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089 (N.D.Ill.1985), has been thrown into both camps. *Compare Haroco,* slip op. at 12 (*Trak* adopts liberal ap-

**10.** The Court was surely correct that if civil RICO is a cancer, the inclusion of mail fraud as a predicate offense is the carcinogen. For decades, the courts have read the mail and wire fraud statutes incredibly broadly. Combine this with the facts that (1) businesses use the mail and phones constantly; (2) that each mailing or phone call furthering a fraud can be a separate crime; (3) that each separate crime is defined in RICO as a separate predicate offense; and (4) that two mailings or calls can, in theory, be a pattern, and you end up with an extraordinarily broad statute. Finally, combine all this with a private civil action, the lure of treble damages and attorney's fees and a hungry private bar, and you end up with RICO's extraordinary and unforeseen (but not unforeseeable) growth.

**11.** Rather than taking the opportunity in *Sedima* itself to develop the "meaningful concept of 'pattern'" that Congress neglected to formulate, the Supreme Court has left this formulation to

the lower courts. The resultant proliferation of diverse and contrary district court opinions is not surprising.

**12.** Cases from other districts and circuits taking a more restrictive tack include *Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986); *Frankart Distributors, Inc. v. RMR Advertising,* 632 F.Supp. 1198 (S.D.N.Y.1986); *Soper v. Simmons Int'l Ltd.,* 632 F.Supp. 244 (S.D.N.Y.1986); *Allright Missouri, Inc. v. Billeter,* 631 F.Supp. 1328 (E.D.Mo.1986); *Fleet Mgt. Systems, Inc. v. Archer-Daniels-Midland Co., Inc.,* 627 F.Supp. 550 (C.D.Ill.1985) (Judge Mills).

**13.** Also falling into the liberal camp are *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir. 1985) (per Judge Wisdom); *Bush Development Corp. v. Harbour Place Associates,* 632 F.Supp. 1359 (E.D.Va.1986); *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985).

proach), *with Brainerd,* slip op. at 8 (lumping *Trak* with restrictive cases).

The courts taking the more restrictive approach start with the language of footnote 14 and the legislative history it cites. As that note says, two predicate acts are *necessary* but not *sufficient* to weave a pattern. This flows naturally from the statutory language that a pattern "requires at least" two predicate acts, not that it "means" two predicate acts. But the language itself does not explain what would make two or more acts sufficient, and it therefore is ambiguous on that score. The legislative history cited in footnote 14 and Justice Powell's dissent sheds some light on what is needed to make out a pattern. The history emphasizes two factors: "continuity plus relationship." As explained in footnote 14, "relationship" means that the predicate acts should somehow be connected by a common perpetrator, method, victim or motive. This is the less difficult standard of the two, as both sides of the pattern debate seem to agree on a definition of "related" predicate acts. *Compare, e.g., Graham,* 624 F.Supp. at 225, and *Inryco,* 615 F.Supp. at 831, *with Haroco,* slip op. at 11–13. But the legislative history says that "pattern" also requires "continuity," and this part of the test, not really explained in footnote 14, has caused the rift in this district.

We know from footnote 14 what continuity is not: "isolated" or "sporadic" activity. *See* S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969). After all, RICO's target was organized crime, and even though the statute is broadly worded so as not to create loopholes, that essential purpose should not be forgotten. Thus, the Senate Report said "[t]he concept of pattern is essential to the operation of the statute," and it emphasized the concept of "continuity" in giving meaning to pattern. But continuity is simply not explained.

The courts taking the more restrictive view have tried to define "continuity" by requiring at least two criminal "episodes."

*See, e.g., Graham,* 624 F.Supp. at 224–25. These courts reason that the concept of "continuity" requires more to make out a pattern than what the *Starnes* and *Weatherspoon* cases found sufficient. For example, two or more mailings which further just one criminal end might satisfy the "relationship" test but they do not by themselves evidence continuing or a threat of continuing criminal activity. To quote Judge Shadur:

> In logical terms, such cases as *Starnes* and *Weatherspoon* were only partly right in fleshing out the concept of "pattern." True enough, "pattern" connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity,* not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity."

*Inryco,* 615 F.Supp. at 831. Hence, the emergence of the "episode." Judge Getzendanner loosely defined "episode" in *Graham.* First, she rejected a blanket requirement that there be multiple fraudulent "schemes" to make out a "pattern."[14] One scheme, for example an open-ended one, can be extensive enough over time and involve so many predicate acts as to be "continuous." Different criminal "episodes" which further one scheme would suffice. Judge Getzendanner describes an episode as "transactions 'somewhat separated in time and place,'" 624 F.Supp. at 224, *quoting United States v. Moeller,* 402 F.Supp. 49, 57–58 (D.Conn.1975). The transactions in that case involved twenty predicate acts stretched out over a two-year period, such that the criminal activity was "ongoing." Moreover, the predicate acts were not "ministerial acts" executing one fraudulent transaction but were "inde-

---

**14.** She rejected Judge Shadur's dictum in *Inryco, see* 615 F.Supp. at 833, that multiple *schemes* were necessary, a more restrictive approach that was followed in *Superior Oil,* 785 F.2d at 257.

pendently motivated" crimes. *Id.* Later opinions have added another characteristic of an episode, asking whether there was one injury or many, *see Medical Emergency,* 633 F.Supp. at 158, or whether the acts have "independent harmful significance." *See Agra,* slip op. at 13; *accord Papai,* 635 F.Supp. at 1409 n. 5.

▮ Although the "episode" approach has been strongly criticized, *see Brainerd,* slip op. at 10–17; *Haroco,* slop op. at 11–13, and although it has not yet produced a focussed definition of "pattern," we agree with the majority that it is the proper course to pursue. The courts rejecting the "episode" view give virtually no weight to "pattern's" inherent and legislative requirement of continuity, focussing instead on "relationship." Two mailings which further one simple fraud cannot in any logical sense be thought of as "continuous" racketeering activity or as threatening the same, even though they might be related to the scheme and by formalistic definition amount to two acts of racketeering activity. For example, one bribe involving two mailings [15] can hardly be called "continuous" criminal activity; it clearly is "isolated." Yet because the mailings are related to each other and the bribe, the critics of the episode view would find a "pattern." This defies common sense and reads the pattern requirement so broadly as to make it almost meaningless. The critics say they are following legislative intent, but they give no weight to the exclusion of "isolated" or "sporadic" activity found in the legislative history. It is precisely this incomplete and overly liberal definition of pattern which the *Sedima* court wanted the lower courts to scuttle in favor of a "meaningful concept."

Yet the criticisms of the "episode" approach are not without some force. Its definitions have hardly been precise and in fact most of the cases do not even define an "episode." At this point, the episode test arguably does not yet satisfy the Supreme Court's desire for a "meaningful concept." Even one supporter of the epi-

sode test called it an "I-know-it-when-I-see-it-approach." *See Papai,* 635 F.Supp. at 1410 (referring to Justice Stewart's famous "standard of review" of obscenity, found in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (concurring opinion)). But the test, while a bit fuzzy, is not incapable of being defined and moves in the direction suggested by *Sedima.* While the pattern question can only be decided on a case-by-case basis, upon consideration of all the circumstances alleged in a complaint, we think several factors can be identified which are relevant to and inform its definition.

▮ The cases reveal several characteristics of the "episode" which are important, and which are consistent with and flow from the underlying concept of "continuity." Probably the most important factor is that the criminal acts cause "independent harmful significance," *i.e.,* cause more than one basic injury. *See Frankart,* 632 F.Supp. at 1201; *Agra,* slip op. at 13. This captures the idea that to be "continuous," criminal activity and injury should repeat or recur. After all, RICO was designed to combat multiple, systematic infliction of harm, not the enterprise which harms one person once. This element of independent harmful significance can play out three ways:

(1) *Separate victims.* Whether or not there is one grand scheme to defraud, a pattern may exist if the multiple predicate acts are directed at and harm more than one person or entity. This idea no doubt informed some of the decisions finding a pattern. *See SJ,* 627 F.Supp. at 577 (misrepresentations made to several different parties, defrauding a series of victims); *Papagiannis v. Pontikis,* 108 F.R.D. 177, 179 (N.D.Ill.1985) (Shadur, J.) (defendant repeats scam to net two victims); *Yonan,* 622 F.Supp. at 728 (ten separate cases fixed over three-month period).

(2) *Separate schemes.* Notwithstanding the debate about whether more than one fraudulent scheme is *necessary* to make

---

**15.** We take this hypothetical from *Papai,* 635 F.Supp. at 1412 n. 8.

out a pattern, *see Graham*, 624 F.Supp. at 224, if there *is* more than one fraudulent scheme, a pattern would probably exist in most cases.

(3) *Separate injuries to one victim in one scheme.* The above two situations are relatively easy. We agree with Judge Getzendanner that a pattern may exist even in the more difficult case where one victim is injured as part of one overall scheme.[16] *See Graham*, 624 F.Supp. at 224. What divides the scheme into "episodes" is multiple, distinct injuries, separated in time and place. This is the factor that eliminates the classic example cited for RICO abuse: to perpetrate one simple fraudulent payment, someone mails two or more letters. Although the mailings can by definition constitute two crimes of mail fraud, and thus two predicate acts, *one* scheme harms *one* victim *once*. Formalistically more than one crime has occurred but realistically only one criminal event has happened. To call this singular criminal event "continuous" or "multiple" criminal activity is to stretch those concepts beyond recognition. Cases relying implicitly on this concept include *Graham, Agra* and *Frankart* as well as this one, as we describe below at 1337–38.

Besides "independent harmful significance" another factor emerges as important from the legislative history, the normal meaning of "continuity," and the cases: the idea of "ongoing criminal activity." *See Sedima* footnote 14, *quoting* S.Rep. No. 91–617 at 158 ("the infiltration of legitimate business normally requires more than one 'racketeering activity' *and the threat of continuing activity* to be effective") (emphasis added); *Sedima*, —— U.S. at ——, 105 S.Ct. at 3289 (Powell, J., dissenting), *quoting,* ABA Task Force on Civil RICO (pattern requires some sort of continuity between the acts or a threat of continuing criminal activity). Thus, a pattern may be established if the alleged facts somehow show ongoing criminal activity or at least reasonably imply a threat of ongoing criminal activity. *See Papai*, 635 F.Supp. at 1412–13.[17] One question relevant to such a determination is whether a scheme is open-ended or of very long duration. The number of criminal acts is also relevant. For example, in *Yonan* the "fixing" of ten separate court cases, besides amounting to ten events of independent harmful significance, suggested ongoing criminal conduct which was likely to continue. In *Graham*, 2-½ years of steady embezzlement involving three different parties and twenty predicate acts was clearly ongoing and open-ended. In contrast, in *Frankart Distributors*, although there were multiple mailings, they were done as part of one fraud involving one contractual relationship; not only was there not multiple injury, there was "a distinct and easily defined beginning and end to the transaction at issue," 632 F.Supp. at 1201, and thus there was no "threat of continuing activity." Similarly, in *Fleet Management*, a series of fraudulent mailings furthering a scheme to obtain and market plaintiffs' computer information did not on its face threaten "ongoing criminal activity."[18] 627 F.Supp. at 560.

In identifying the above factors, we do not mean to imply that all must necessarily be present in order to find a pattern. The pattern question remains one to be decided in teh context of a given case, upon consideration of all the facts alleged. Our attempt here was to identify some of the concepts underlying the growing body of law addressing the issue, hopefully to make the process more uniform in the future.

Before turning to the facts of this case, we will briefly address some of the criticisms leveled at the "episode" approach. One is that footnote 14 focusses on the

---

**16.** We therefore reject the overly restrictive approach found in *Superior Oil.*

**17.** *Papai* makes this factor mandatory. We hesitate to etch this factor in granite. It is highly relevant to finding a pattern, but we do not now

need to hold that it must exist in every case, since it does exist in this case. *See* below at 1337–38.

**18.** There were also but a single victim and single injury in that case.

"relationship" factor, and cannot reasonably be read to invite the lower courts to run amok with "continuity." *See, e.g., Brainerd,* slip op. at 10. But focussing only on relationship is what the courts were doing before *Sedima* (as in *Weatherspoon* and *Starnes*), with the result that isolated criminal activity amounted to a pattern. Footnote 14 does mention continuity and ongoing criminal activity as relevant and the Court later in a second dictum again singles out the failure to make pattern "meaningful." This clearly is a signal to abandon old approaches. We agree with Judge Shadur that *Sedima* "clearly creates a whole new ballgame," freeing the Court from its obligation to follow prior, contrary opinions of the Court of Appeals. *Inryco,* 615 F.Supp. at 833.

Second, the critics suggest that the Seventh Circuit reaffirmed *Weatherspoon* in *Illinois Dept. of Revenue v. Phillips,* 771 F.2d 312, 315 (7th Cir.1985). *See, e.g., Brainerd,* slip op. at 11. The court there in finding a "pattern" cited *Weatherspoon.* Remarkably, the court discussed neither *Weatherspoon* nor the implications of *Sedima.* In any event, the facts of *Phillips* yield a "pattern" under the episode test as expounded above. The defendant there was required by law to send monthly sales tax returns to the state. For nine straight months he mailed tax returns lying about his receipts. Obviously, each mailing had "independent harmful significance" and constituted a separate episode; each month he told a new lie to the State and underpaid new taxes which had accrued; each month's lie and resulting underpayment was independent of the others. Moreover, the conduct was ongoing and regular rather than isolated and implied a threat of continuing activity. Thus, we agree with other courts that have found *Phillips* consistent with an "episode" test. *See Medical Emergency,* 633 F.Supp. at 158; *Papai,* 635 F.Supp. at 1409 n. 6. In light of this consistency and of the case's failure to

address *Sedima,* we think we still may adhere to our interpretation of *Sedima.*

Third, the critics say that the episode test flouts the tradition of reading RICO both literally and liberally as a remedial statute. "We have insisted ... that RICO be given the broad effect its plain language suggests." *Phillips,* 771 F.2d at 312; *see also Ray v. Karris,* 780 F.2d 636, 645 (7th Cir. 1985) (court "re-emphasize[s] [its] commitment ... to a broad and literal reading of RICO in accord with Congressional intent....); D. Moran, *The Meaning of Pattern in RICO,* 62 Chi-Kent L.Rev. 139 (1985). But our reading is consistent both with the language of the statute and with Congress' intent as revealed by the brief legislative history. As noted earlier, the statute was ambivalent as to when two or more predicate acts amount to a pattern. The history reveals the importance of the idea of continuity in defining a "pattern." We here tried to give content to continuity, in a way which gives it some sense yet retains the liberal spirit of the statute. It is still possible under the episode approach for two predicate acts to amount to a "pattern," despite that word's connotation that "two of anything do not generally form a 'pattern.'" *Sedima,* footnote 14. This is still a very liberal result. The policy of reading RICO liberally does not command a court to be as liberal as it possibly can, in fact, to be so liberal as to disregard the legislative history and read the concept of continuity out of the word "pattern". Our exposition above leaves "pattern" and RICO extraordinarily broad. Many cases, like this one, *see* below, will still get into federal court even though they are effectively state law frauds. *See, e.g., Graham,* 624 F.Supp. at 224–25.

Finally, the critics complain that the episode test yields inconsistent results and is incapable of definition. *See Brainerd,* slip op. at 12–17. While we concede that the cases show some inconsistencies,[19] that

---

**19.** For example, different tests have emerged, such as in *Superior Oil* and *Graham.* This disagreement over how strict to be hardly means we should not be stricter at all. And if some of

the cases are indeed inconsistent on the facts, *see Brainerd* at 12–17, that does not mean the standard is inherently vague. Rather, it means the courts have not yet settled on a consistent

does not mean that a coherent test that everyone agrees on will not emerge. Most cases have not attempted to do what we have done, flesh out the identifying characteristics of the "episode," using the concept of "continuity" as a guidepost. The Supreme Court has ordered us to try to come up with a meaningful, workable concept, and we think that as courts apply the new test to more fact situations a viable concept will emerge. Many areas of the law begin with general, fluid concepts whose meanings develop as courts consider more and more fact situations.

And so we turn at last to the facts of this case and find that they satisfy the criteria for a pattern. First, the four forgeries were related in victim, method and perpetrator. Second, each had "independent harmful significance" constituting separate "episodes." There were four separate forgeries and conversions of different sums, taking place over a one-year period. These were not simply ministerial acts to accomplish one fraud, but appear to have been four independently motivated crimes injuring Ghouth four times. Moreover, the recurrence of the forgeries, as well as the other alleged abuses of Ghouth's money reasonably imply a threat of ongoing criminal activity. Despite the fact that only one victim is apparent, the alleged, independent crimes were repeated enough over a long enough time to satisfy a liberal definition of continuity. Of course, even if we were wrong about our analysis of "pattern" above, the alleged conduct would clearly amount to a "pattern" under the older *Weatherspoon* approach. In sum, then, the motions to dismiss are denied to the extent they rely on the pattern issue.

### D. *Conclusion*

For the reasons given above, defendants Conti Ltd. and Refco are dismissed from the suit. Conti's motion to dismiss is granted as to Count III and denied in all

definition and concept. As courts continue to confront cases, and as appellate courts start

other respects. Dinshaw's motion to dismiss is denied. It is so ordered.

ruling on the issue, the law will become more uniform in this area.