Anthony R. BIEGANEK and Marie B. Bieganek, Plaintiffs,

v.

Gary P. WILSON, a Florida Resident, John Doe Ross, an Illinois Resident, Harry Taylor, a Citizen of Great Britain, Private Ledger Financial Trust, Wilson-Ross Commodities, a Florida Corporation, Rouse Woodstock, Inc., an Illinois Corporation, and Oppenheimer and Company, a Delaware Corporation, Defendants.

No. 84 C 10899.

United States District Court, N.D. Illinois, E.D.

Aug. 13, 1986.

Louis R. Hegeman, Kathryn S. Mueller, Michael S. Allen, Gould & Ratner, Chicago, Ill., for plaintiffs.

Gary A. Schultz, James E. Beckley, James E. Beckley & Assoc., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Anthony and Marie Bieganek sue for damages allegedly suffered because of commodities fraud by the defendants. Their ten-count amended complaint includes claims under the Commodities Ex-change Act ("CEA"), 7 U.S.C. § 1 *et seq.*, the Racketeer Influenced and Corrput Or-ganizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as pendent common law claims for fraud and conversion. Defend-ants Gary Wilson ("Wilson"), Oppenheimer & Co. ("Oppenheimer") and Rouse-Wood-stock, Inc. ("Rouse") have moved to dis-miss the complaint, and Oppenheimer has since moved also for summary judgment. For the reasons stated below, the motions to dismiss are granted in part and denied in part, and Oppenheimer's motion for sum-mary judgment is granted.

### A. *Facts*

We take the following facts from the amended complaint, assuming their truth for purposes of the motions to dismiss. We will state additional facts later in con-nection with the summary judgment mo-tion.

The Bieganeks are a retired couple living on a fixed income in Florida. On May 10, 1983, they opened a commodities trading account, which was part of defendant "Pri-vate Ledger Financial Trust." The interest in the fund was sold to the Bieganeks by defendant "Wilson-Ross Commodities," which was an agent of Rouse and Oppen-heimer and staffed by Wilson. Wilson and defendant Harry Taylor,[1] also an agent of Wilson-Ross and Rouse, promised the Bie-ganeks group health insurance and com-missions if Anthony Bieganek would be-come an "associated person" of Rouse. They also guaranteed the Bieganeks' equi-ty for one year. However, $80,000 of the Bieganeks' $100,000 investment hemor-rhaged within nine months, which prompt-ed this suit.

The first five counts of the amended complaint allege violations of the CEA. The first two are most significant to the motions to dismiss. Count I alleges "churning," that is, that defendants traded heavily on the Bieganeks' account in order to create commissions for themselves rath-er than profits for the Bieganeks. Count

---

1. Taylor, as well as defendants Wilson-Ross and Private Ledger, defaulted and judgment has been entered against them. Taylor appealed and the appeal is pending.

II alleges "unsuitability," meaning that defendants should have recognized that commodities trading was too risky (*i.e.*, "unsuitable") for investors in the Bieganeks' position, and that defendants should have tried to steer the Bieganeks away from commodities. Count VI sounds in RICO, predicated on allegations of mail and wire fraud, and most of the other claims are in the nature of fraud.

### B. *Particularity of Pleading*

The motions to dismiss assert that the Bieganeks did not detail the fraud as required by Fed.R.Civ.P. 9(b). This attack takes two forms. They charge that churning is not pled with enough specificity, and they also argue that the rest of the fraudulent scheme lacks detail. Except for the alleged RICO violations, we disagree with defendants as to this attack on the complaint.

■ 1. *The general allegations of fraud.* Rule 9(b) does not supplant Rule 8(a)(2) in fraud cases. As the Seventh Circuit has explained, Rule 9(b) requires only "slightly more specificity" than demanded under normal notice pleading. *Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir.1975); *Ghouth v. Conticommodity Services, Inc.*, 642 F.Supp. 1325, 1331 (N.D.Ill.1986) (Aspen, J.). In alleging the fraud, the plaintiff must sketch the time, place and contents of the false statements, as well as who made them and what harm was done; conclusory allegations do not suffice. *See, e.g., D & G Enterprises v. Continental Illinois Nat'l Bank*, 574 F.Supp. 263, 267 (N.D.Ill.1983) (Aspen, J.). But a plaintiff need not clutter his complaint with evidence. *See, e.g., Caliber Partners Ltd. v. Affeld*, 583 F.Supp. 1308, 1311 (N.D.Ill.1984) (Shadur, J.). Rather, a plaintiff can outline "in broad strokes" the essential facts of the fraud. *See, e.g., Adair v. Hunt Int'l Resources Corp.*, 526 F.Supp. 736, 744 (N.D.Ill.1981) (Moran, J.).

The complaint alleges, among other things, that Taylor and Wilson persuaded the Bieganeks to part with $100,000 by offering them a false "equity guarantee"; they also told the Bieganeks that Anthony would receive commissions as an "associated person," which he never received. The Bieganeks also say that they asked Wilson "on numerous occasions" between May 10, 1983 and February 17, 1984, about their account and about commissions and losses appearing in account statements; Wilson allegedly lied, telling them not to worry because the statements were in error. This lie lulled them into not learning of the true status of their account until it was too late. Each of the above misrepresentations is alleged to have been made knowingly, with intent to deceive the Bieganeks. We think the Bieganeks have adequately sketched the details of the fraud, including time, place and content, putting defendants on fair notice under the above standards of the charges against them and enabling them to frame an answer. Specifically, Counts III (false representations concerning account status) and VII (common law fraud) are clearly pled with enough detail. Similarly, Counts IV (making equity guarantee in violation of 17 C.F.R. § 1.56) and Count V (failing to honor that guarantee) are specific enough when read in conjunction with paragraphs 9–21, which set out the factual details.[2]

■ Only Count VI (RICO) is not pled with enough detail. A RICO claim predicated on mail or wire fraud must sketch out both the scheme to defraud and how the mail or wires furthered that scheme. *See, e.g., Ghouth*, 642 F.Supp. at 1331; *Dunham v. Independence Bank of Chicago*, 629 F.Supp. 983, 986 (N.D.Ill.1986). A plaintiff must identify the mailings and the role they played in the fraud. *See, e.g., Ghouth*, 642 F.Supp. at 1331; *Harris Trust & Savings Bank v. Ellis*, 609 F.Supp. 1118, 1123 (N.D.Ill.1985) (Aspen, J.) (plaintiff must

---

**2.** Defendants' argument that some of the alleged misrepresentations were just "puffing" merely raises a factual question for trial. Construing the complaint in a light favorable to the Bieganeks, we cannot say at this time that Wilson was puffing rather than misrepresenting facts.

sketch *who* caused *what* to be mailed *when*, and *how* the mailing furthered the scheme). Here the Bieganeks do no more than say generally that defendants used the mails and wires more than twice, without saying who mailed what or called whom and how that advanced the fraud. These skeletal allegations plainly lack the meat required by Rule 9(b). *See, e.g., Ghouth*, 642 F.Supp. 1331–32.[3]

2. *Churning.* In assessing the sufficiency of the allegations of churning, we need to examine both what churning is and what is alleged. Churning occurs when a broker trades excessively, placing his selfish interest in commissions over the needs and trading objectives of his customer. *See, e.g., Bowley v. Stotler & Co.*, 751 F.2d 641, 644 (3d Cir.1985); *Hagstrom v. Breutman*, 572 F.Supp. 692, 698 n. 7 (N.D. Ill.1983) (Will, J.). Churning violates § 4b of the CEA, 7 U.S.C. § 6b, although the Commodities Futures Trading Commission ("CFTC") has not formally defined it by rule. Two key elements of churning are control over the account by the broker and "excessive trading." *Hagstrom*, 572 F.Supp. at 698 n. 7. Only this second element is disputed here, and its definition is elusive. The existence of excessive trading "is a question of fact which cannot be determined by any universally applicable precise formula." *Bowley*, 751 F.2d 646. Several indicia are relevant, such as "the annualized commission-to-equity ratio, the turnover rate,[4] and a pattern of in-and-out day trading." *Id.* Other relevant factors include failure to follow an agreed upon trading strategy, or, indeed, any strategy at all. *In Re Lincolnwood Commodities, Inc. of California*, Comm.Fut.L.Rep. (CCH) ¶ 21,980 at 28,248–50 (CFTC Jan. 31,

1984) (extensively discussing indicia of churning).

As a species of fraud, churning must be alleged with some specificity. *Hagstrom*, 572 F.Supp. at 698. As we held in the context of churning in a securities case, the plaintiff must identify the securities involved, the nature, amount and dates of transactions in issue, as well as sufficient facts to allow for a determination of the turnover rate in the account and/or the percentage of the account value paid in commissions. *Russo v. Bache Halsey Stuart Shields, Inc.*, 554 F.Supp. 613, 618 (N.D.Ill.1982).

Count I alleges that defendants controlled the Bieganeks' account, and that they traded excessively, including making excessive "day trades" which generated huge losses after commissions or in which huge commissions dwarfed meager profits. Attached to the complaint are all of their monthly account statements, as well as trade confirmation statements. These identify every trade defendants made, the profit or loss from each and the amount of commission generated. The Bieganeks allege that this comprehensive exhibit "allows for a calculation of the commission-to-equity ratio and various other ratios in their account, which ratios Plaintiffs assert to be excessive in light of Plaintiffs' circumstances and objectives." Amended Complaint, ¶ 40.

To the extent the complaint refers vaguely to "various other ratios," it is defective. Standing alone, this says no more than "the churning is in there somewhere," leaving it for defendants to figure out where. This is neither fair notice nor pleading with specificity. However, to the extent the complaint alleges excessive day trading

---

**3.** We also doubt that the Bieganeks have adequately alleged a "pattern of racketeering activity" under 18 U.S.C. § 1961(5). The definition of pattern has recently been narrowed by several courts, including the one. *See Ghouth*, 642 F.Supp. 1333–39 (and cases cited therein). Here the Bieganeks allege merely that there were at least two mailings, which formed a pattern. Besides the obvious particularity problems with such an allegation, it also fails to satisfy RICO's

requirement that a pattern consist of related and continuous racketeering activity. *Id.*

**4.** The turnover rate is a less reliable indicator of churning of commodities than of securities, because commodities are traded far more frequently and held far shorter periods than are securities. *See, e.g., In Re Lincolnwood*, cited in text.

and a high commission-to-equity ratio, it states a churning claim with enough specificity. The exhibit attached to the complaint allows for determination of these figures, while it would be better practice to give a rough calculation of the commission-to-equity ratio and the number of day trades, the complaint and exhibit give defendants fair notice that this is the nature of the churning alleged.[5] Whether the day trades and ratio are "excessive" is a factual question which can be resolved on the basis of a full record.

Defendants objection that the amended complaint does not identify "which" day trades were "objectionable" misses the point of churning entirely. A plaintiff need not scrutinize every trade in the complaint, dividing each one into "objectionable" and "unobjectionable" categories. The point of churning is that the *aggregate* of trades is excessive. *See, e.g., Russo*, 554 F.Supp. at 617 (churning involves a series of transactions, not a single transaction). Churning may be inferred when the *total number* of trades is extremely high under all the circumstances, when the *total* commissions dwarf equity. These questions can be decided at trial or summary judgment. A plaintiff need not allege in a complaint that trade A was proper while trade B was not. The motion to dismiss the churning claim is denied.

### C. *Unsuitability*

■ Count II is based on a theory of "unsuitability," meaning that defendants violated the CEA by inducing the Biega-neks to trade in the volatile commodities market even though such a risky venture was "unsuitable" to their financial condition and investment needs. Defendants argue that the CEA affords no special right to relief for "unsuitability." We agree, although the issue is not as clear-cut as defendants suggest.

"Suitability" is not a new concept. For a number of years the Securities and Exchange Commission ("SEC") regulated broker-customer relations under a suitability standard. Its suitability rule, 17 C.F.R. 240.15b10–3 (1967)[6] established a "know your customer" standard which provided a basis for relief against certain broker dealers who made trades not reasonably suited to the customer's financial objectives. During the lifetime of the SEC's rule,[7] the CFTC considered adopting one like it, which would have required that commodity professionals "know their customers." The proposed rule had two components. The first, "the suitability inquiry," would have required the broker to gather enough financial data about a customer to decide whether commodity trading in general suited the customer's objectives and financial condition. The second, called "the suitability determination," would have governed individual trades and prohibited the broker from advising or trading for a customer unless the broker "had reason to believe, at the time of the recommendation or trade, that the position would be 'suitable' for the customer based on the information known

---

5. In *Russo, supra*, the plaintiffs amended their complaint after we had dismissed it for failing to plead churning with specificity. They attached account statements to their amended complaint, which set forth the trades and dates complained of, and allowed for calculation of turnover ratio. We denied a second motion to dismiss, holding the amended complaint and exhibit pled the churning claim with specificity. *Russo v. Bache*, 82 C 4219, slip op. at 3 (N.D.Ill. May 3, 1983). Likewise, the Bieganeks here have fair notice of the churning claim: the account statements allegedly reveal an excessive number of day trades and commission-to-equity ratio.

6. That rule read:

§ 240.15b10–3 Suitability of recommendations.
Every nonmember broker or dealer and every associated person who recommends to a customer the purchase, sale or exchange of any security shall have reasonable grounds to believe that the recommendation is not unsuitable for such customer on the basis of information furnished by such customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other information known by such broker or dealer or associated person.

7. The SEC repealed the rule on December 6, 1983, in light of legislative amendments eliminating the so-called "SECO program." *See* Fed. Sec.L.Rep. (CCH) ¶ 83,457 (SEC Nov. 22, 1983).

to the professional." Consumer Protection Rules (Proposed), 42 FR 44742, Com.Fut.L. Rep. (CCH) ¶ 20,474 at 21, 928 (CFTC Sept. 6, 1977). The CFTC said a rule was needed because customers often did not appreciate the risks they were taking and because of sales tactics by brokers. It felt that mere disclosure of risks did not adequately protect customers. *Id.* at 21,928–21,929.

Ultimately, however, the CFTC decided not to adopt the proposed rule. It also declined to adopt a proposed rule regarding churning. It gave brief reasons:

> (1) those provisions would merely have codified principles that are implicit in the anti-fraud provisions of the Act and the CFTC's rules and (2) the benefits to be gained from codification are outweighed by the risk of unintentionally narrowing the scope of these provisions.

Comm.Fut.L.Rep. (CCH) ¶ 20,642 (CFTC July 24, 1978). The Commission added that it might adopt a suitability rule later if it could develop "meaningful standards." *Id.* It appears, then, that at least in 1978, the CFTC believed that a suitability theory was implicit in the CEA. It apparently did not adopt a rule defining it because it could not develop "meaningful standards" of universal application, leaving suitability to be defined on a case-by-case basis. It did the same thing with respect to a churning rule. However, while "churning" has been widely recognized since 1978 to violate the CEA, "unsuitability" has not.

Most administrative and judicial decisions since 1978 reject the suitability theory. Remarkably, most do it in dictum and rely either on a misreading of the above history or on other decisions misreading the history. Typically, the decisions use the following simplistic and false syllogism: (1) the CFTC considered adopting a suitability rule; (2) it did not adopt such a rule; (3) therefore, it rejected the notion that the CEA embraces the suitability concept. Decisions using this reasoning include *J.E. Hoetger & Co. v. Asencio*, 558 F.Supp. 1361, 1364 (E.D.Mich.1983); *see also Myron v. Hauser*, 673 F.2d 994, 1005–06 (8th Cir.1982) (dictum); *Avis v. Shearson Hay-*

*den Stone, Inc.*, Comm.Fut.L.Rep. ¶ 21,379 at 25,829–30 n. 4 (CFTC April 13, 1982) (dictum). Cases merely citing the above decisions as authority include *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 34–35 (1st Cir.1986) (dictum); *Vaneck v. Bache Halsey Stuart Shields, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 21,697 at 26,733 (CFTC Mar. 30, 1983). Our analysis above exposes the obvious flaw in the syllogism. The CFTC declined to adopt a *general* suitability *rule;* it did not reject a suitability concept to apply in *specific* fact situations. To the contrary, it felt that suitability was *already* implicit in the CEA, and it said it was rejecting a formal rule so as not to *narrow* that concept. If the syllogism were correct, "churning" would also not violate the CEA, since the CFTC declined to adopt a churning rule as well.

To our knowledge, only one tribunal, an ALJ, has pierced the syllogism and thoroughly analyzed the history described above. *See Phacelli v. Conticommodity Services*, Comm.Fut.L.Rep. (CCH) ¶ 22,345 (CFTC September 12, 1984) (Shipe, ALJ); *also Shefter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 23,022 (CFTC April 23, 1986) (Shipe, ALJ); *LePley v. Ray E. Friedman & Co.*, Comm.Fut.L.Rep. (CCH) ¶ 22,487 (Feb. 12, 1985) (Shipe, ALJ). This maverick concluded from the above analysis that a customer could rely on an unsuitability theory to recover damages under the CEA. A second ALJ recently followed Judge Shipe. *See Yi v. Int'l Trading Group, Ltd.*, Comm.Fut.L.Rep. (CCH) ¶ 22,958 (CFTC Mar. 13, 1986).

Despite our disagreement with the superficial historical analysis of the decisions rejecting the suitability theory, we agree with their result and reject the conclusions of the maverick ALJ. We do so for two principal reasons. First, the CFTC appears to have retreated from its stance in 1978. Second, nothing in the legislative history specifically supports recovery on a suitability theory.

While the CFTC clearly looked favorably on the unsuitability theory in 1978, we can-

not help but recognize it has retreated from that position. In *Jensen v. Shearson Hayden Stone, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 21,062 (CFTC July 28, 1980), ALJ Shipe had grounded a decision in part on a suitability theory. The CFTC declined to review the case, but in doing so said that it did not adopt the ALJ's opinion as its own. Specifically, it said, "the Commission wishes to disavow the judge's reference to, and discussion of, suitability," Comm.Fut. L.Rep. (CCH) ¶ 21,324 n. 1 (CFTC Oct. 9, 1981). The CFTC allowed the ALJ's decision to bind the parties but "not be binding as a Commission decision in other cases." Despite this rebuke, ALJ Shipe continued to find suitability duties in the CEA, as we noted above. Later, in *Avis v. Shearson Hayden Stone, Inc.*, Comm.Fut.L.Rep. ¶ 21,379 at 25,829–30 n. 4 (CFTC April 13, 1982), the CFTC rebuked an ALJ for grounding a holding on suitability when it did not need to do so, since there were other grounds for the alleged fraud. The CFTC noted that it had rejected adoption of a suitability rule and concluded, "[t]o the extent that the judge in his decision below suggests that suitability principles are implicit in any of the provisions of the Act, the Commission does not adopt such reasoning." *Id.*

These two decisions are ambiguous, perhaps in part because they address the suitability issue in passing dictum. They can be read (as some have read them) as a rejection of suitability entirely. But they can be read more narrowly as a command to ALJs not to address the suitability issue unless necessary. In both cases the ALJs did not need to address the issue. In "disavowing" and "declining" to adopt the ALJ's reasoning, the CFTC arguably stopped short of rejecting suitability, opting to decide the issue only when it had to and emphasizing that its affirmances of ALJs' opinions were not adoptions of their reasoning. We need not resolve this ambiguity. Even if we read the CFTC's decisions the narrow way, we see that the CFTC has retreated from its position in 1978 that the Act implicitly embraces a suitability theory. At best for plaintiffs,

the CFTC now has strong doubts on the issue and is undecided. It is no longer clearly endorsing the theory, although it perhaps has not rejected it.

Of course, whether the CEA implies a suitability requirement ultimately turns on legislative intent. The CFTC's construction of the statute is not binding on the Court, although as the agency charged with construing and applying the Act, its views are relevant and deserve substantial deference. *See, e.g., Suburban O'Hare Commission v. Dole*, 787 F.2d 186,200 (7th Cir.1986). Deference is especially appropriate where the agency's construction is not the only valid one and where there is no contrary legislative intent. *See, e.g., NLRB v. Manley*, 779 F.2d 1327, 1331 (7th Cir.1985). This is not so much a case of deciding whether an agency interpretation is correct as it is one where the deciding agency has not made up its mind yet and has expressed doubts about a certain construction. Nevertheless, we think deference is appropriate in this case. The CFTC has considerable expertise in the field of commodities trading. It is well equipped to weigh the plusses and minuses of intervening in customer-broker relations by imposing a suitability requirement. We hesitate to reach out and impose such a duty while the CFTC has such strong doubts about it. If there were some legislative history supporting a suitability requirement, we might well decide to bypass the CFTC's ambivalent steps on the question to blaze a new trail. But we found no indication one way or the other in the legislative history. Lacking any guidance from Congress, and clear signals from the administrative agency with expertise in the area, we decline to be the first court to hold that the CEA implicitly imposes a suitability rule on brokers. Accordingly, we grant defendants' motion to dismiss Count II.

### D. *Count VIII—Conversion*

■ Count VIII alleges that defendants converted unknown sums from the Bieganeks' account, including $25,000 on July 12, 1983, and $1,000 once on September 1, 1983, and again on September 28, 1983.

Defendants attach to their motion a document signed by the Bieganeks, dated June 1, 1983, authorizing Wilson to transfer $24,500 "at the earliest possible moment." They also attach two affidavits of Wilson essentially saying that the Bieganeks signed the form with open eyes. Defendants argue Count VIII must be dismissed because of this authorization. Since defendants point to matters outside the complaint, we must convert their motion into one for summary judgment and analyze it under Fed.R.Civ.P. 56.[8] *See* Fed.R.Civ.P. 12(b). It is clear that a genuine issue of fact exists as to Count VIII, and so the motion must be denied.

The purported authorization and affidavits do not satisfy defendants' burden of showing no factual dispute as to the alleged conversion. Even if we assume that the authorization was not fraudulently induced, it only authorizes withdrawal of *$24,500* and is dated June 1, 1983. The complaint alleges that *$27,000* was converted in three increments, $25,000, $1,000 and $1,000. Thus, the authorization—even if valid—does not match the amounts withdrawn. We may reasonably infer that this was an unrelated authorization. We therefore cannot say no factual dispute now exists, especially since the first withdrawal was made six weeks after an authorization to withdraw "at the earliest possible moment." Wilson's second affidavit, containing some self-serving explanations, does not erase the factual dispute.[9] We agree with the Bieganeks that they are entitled to discovery on this claim.

### E. *Oppenheimer's Summary Judgment Motion*

■ Oppenheimer moves for summary judgment, asserting that no evidence ties it to Rouse or Wilson during the dates of the alleged fraud, and that it therefore cannot be held accountable. We agree and grant the motion.

Summary judgment, where proper, is "not ... a disfavored procedural shortcut, but rather ... an integral part of the Federal Rules as a whole...." *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2554–2555 (1986). It protects the parties and the court from the time and cost of an unnecessary trial. To prevail on its motion, Oppenheimer must show that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We must view the evidence in the light most favorable to the Bieganeks and indulge them all reasonable inferences. *See, e.g., Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). If Oppenheimer cannot meet its strict burden, its motion fails, even if the Bieganeks were to mount no opposition. *Id.* But if it does carry its burden, the Bieganeks shoulder the resulting burden of creating a genuine issue of material fact; to meet this burden the Bieganeks cannot rely on the pleadings, but must produce relevant evidence or affidavits. *See* Fed.R.Civ.P. 56(e); *Big O*, 741 F.2d at 163.

The undisputed facts reveal that the Bieganeks opened their account in May 1983. Wilson dealt with the Bieganeks as an agent for his firm, Wilson-Ross, which in turn acted for Rouse. Oppenheimer and Rouse were then separate, sister corporations, both subsidiaries of a corporation named "Mercantile House Place." The Bieganeks have no evidence implicating Oppenheimer in any of the misconduct alleged to have occurred in 1983. They admit they had no contact with anyone from Oppenheimer.

Oppenheimer does not come into the picture until 1984. On May 1, 1984, it purchased the stock of Rouse. Being very generous to the Bieganeks, we will accept its belief that some evidence suggests that Oppenheimer began intervening in Rouse's affairs before May 1, perhaps as early as January 1, 1984. It appears that Oppenheimer might have begun reorganizing

---

**8.** *See* below at 775 for discussion of the standards imposed by Rule 56.

**9.** Of course, we make no factual findings at this juncture. We merely hold that after viewing the record in a light favorable to the Bieganeks, a genuine issue of material fact exists.

Rouse's affairs then, starting the process of moving Rouse's affairs to New York. However, we have seen no evidence suggesting that Oppenheimre had anything to do with the alleged fraud against the Bieganeks. The Bieganeks never had contact with anyone from Oppenheimer, and no Oppenheimer agent controlled their account. The equity guarantee and other relevant fraudulent promises were made by Wilson and/or Rouse.

Oppenheimer is correct that hornbook law lets it off the hook. In general, one corporation owning and controlling another corporation is not responsible for the other's liabilities, absent fraud or bad faith. *See, e.g., Pasco Intern (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 502–03 (7th Cir.1980); *N.Y. State Teamsters Conference Pension and Retirement Fund v. Hoh,* 554 F.Supp. 519, 525 (N.D.N.Y.1982). The parent and subsidiary are presumptively separate, and this presumption is not rebutted unless the subsidiary is the "mere instrumentality" of the parent. *Van Dorn Co. v. Future Chemical & Oil Corp.,* 753 F.2d 565, 569–71 (7th Cir.1985) (Illinois law); *Pasco,* 637 F.2d at 502; *Teamsters,* 554 F.Supp. at 525. Not only must the parent extensively dominate and control the subsidiary, it must further appear that observing the fiction of separate existence would sanction a fraud or promote injustice. *See Van Dorn,* 753 F.2d at 570. Also, the control must proximately cause the plaintiff's injury. *See, e.g., Teamsters,* 554 F.Supp. at 525. Several facts may be relevant in determining whether the subsidiary is a "mere instrumentality," such as whether the corporations have common directors, whether the subsidiary operates as a separate business, whether it is adequately capitalized and so on. *See Steven v. Roscoe Turner Aeronautical Corporation,* 324 F.2d 157, 160–61 (7th Cir.1963). Here there is simply no evidence that Rouse was ever a "mere instrumentality" of Oppenheimer and that it somehow caused the Bieganeks harm.

First, even the Bieganeks appear to concede that throughout 983 Oppenheimer had no contact with the Bieganeks or control over Rouse. They took no part in Wilson's alleged misrepresentations of May 1983. We reject their rather lame contention that it is somehow liable as Rouse's sister corporation during 1983. No evidence supports an inference that Oppenheimer influenced Rouse at all then. Indeed, it is less likely that one corporation could dominate its "sister" than a parent could control a subsidiary. In sum, the Bieganeks have not shown anything to indicate that Rouse was a "mere instrumentality" of Oppenheimer in 1983.

Turning to 1984, and looking at the evidence with excessive generosity to the Bieganeks, we see that Oppenheimer may have begun to exert some control over Rouse by the beginning of the year, several months before its formal acquisition of Rouse on May 1, 1984. Yet the evidence clearly does not indicate that Rouse was a mere instrumentality of Oppenheimer. At most, Oppenheimer began the process of reorganizing Rouse's general operations. This simply does not satisfy the strict "instrumentality" test outlined above. Even if we assume that Oppenheimer exerted some control over Rouse in early 1984, as most parents do over subsidiaries, there is no evidence that this control was so tight as to overcome the "presumption of separateness" imposed by the above case law. The Bieganeks do not even address the case law or argue that Rouse was a mere instrumentality in early 1984. Nor do they produce any evidence, as they must, that Oppenheimer's actions were causally related to the fraud against the Bieganeks, who closed their account by February 17, 1984.

Finally, we reject the Bieganeks' claim that Oppenheimer is somehow bound by events occurring in June and July 1984. Its only evidence is that they wrote Wilson, with a copy to Rouse, to demand that he honor the equity guarantee. Wilson's lawyer responded in a letter by denying liability. Both letters contain typical lawyerly threats of litigation. This "demand and threat letter" does not implicate Oppenheimer, and the Bieganeks fail to explain otherwise. Even though a copy was sent

to Rouse, which was by then officially Oppenheimer's subsidiary, the Bieganeks again ignore the "mere instrumentality" test and present no evidence sufficient overcome the "presumption of separateness." Even if the "equity guarantee" is valid and binding under the above case law, Oppenheimer did not become party to it by simply becoming Rouse's parent one year later.

In short, then, we conclude that Oppenheimer has carried its burden of showing that no genuine issue of material fact exists as to whether it is legally responsible for Rouse and Wilson's alleged wrongs. The Bieganeks have not met their resultant burden of creating a genuine issue. Summary judgment is therefore appropriate. In light of this holding, we need not reach Oppenheimer's alternative argument based on certain documents signed by the Bieganeks; nor need we rule on the Bieganeks' motion to strike that part of Oppenheimer's motion.

### Conclusion

To summarize, the motion to dismiss is granted as to Counts II (suitability) and VI (RICO) and denied in all other respects. Oppenheimer's motion for summary judgment is granted. It is so ordered.