**WABASH VALLEY POWER ASSOCIATION, INC.**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., et al.**

No. IP84–252–C.

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 4, 1988.

Don F. Morton, Peter L. Obremskey, Parr, Richey, Obremskey & Morton, Wabash Valley Power Ass'n, Lebanon, Ind., Lee A. Freeman, Jr., Freeman, Freeman & Salzman, Chicago, Ill., for Wabash Valley Power Ass'n, Inc., plaintiff.

Jerry P. Belknap, Barnes & Thornburg, Indianapolis, Ind., William E. Wurtz, Davis

Polk & Wardwell, New York City, for Public Service Co. of Indiana, Inc., defendant.

Richard S. Ewing, Stewart, Irwin, Gilliom, Meyer & Guthrie, Indianapolis, Ind., Samuel Weisbard, McDermott, Will & Emery, Chicago, Ill., for Sargent & Lundy Engineers, defendant.

Jim A. O'Neal, Ice Miller Donadio & Ryan, Indianapolis, Ind., for Management Analysis Co., defendant.

Douglas J. Hill, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, Ind., Edward M. White, Carey, Filter, White & Boland, Chicago, Ill., for Gust K. Newberg, defendant.

## ENTRY

DILLIN, District Judge.

This cause comes before the Court on defendants' motion to dismiss plaintiff's second amended complaint and to strike, defendants' brief in support, plaintiff's memorandum in opposition, and defendants' reply brief. The defendants' motion to dismiss and to strike also incorporates by reference defendants' previously filed motion for partial summary judgment. The Court, having considered the foregoing and being duly advised, hereby denies the defendants' motion to strike, denies the defendants' motion to dismiss, and grants the defendants' motion for partial summary judgment, on Count I, alleging securities law violations.

The plaintiff, Wabash Valley Power Association, Inc. (hereinafter "WVPA"), is an Indiana not-for-profit corporation that has been deemed to be a public utility under the laws of Indiana. As described by the plaintiff, WVPA is an electric energy generation and transmission cooperative that has as its members twenty-four (24) Rural Electric Membership Cooperatives located in Indiana, Michigan, and Ohio. On February 1, 1978, WVPA and Public Service Company of Indiana, Inc. (hereinafter "PSI"), a public utility organized as a for-profit corporation pursuant to Indiana law, entered into several contracts to construct and operate the Marble Hill Nuclear Plant (hereinafter "Marble Hill" or the

"Project"), which was to be located near Madison, Indiana. Following abandonment of the Project, WVPA commenced this action against PSI. WVPA filed its original complaint in this cause on February 10, 1984 and alleged violations of the Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a), the Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Thereafter, on March 2, 1984, WVPA filed its first amended complaint. The amended complaint added an allegation of fraudulent concealment, which was directed at tolling the applicable statute of limitations. On April 19, 1984, PSI filed a motion for summary judgment on the basis that the contracts executed by PSI and WVPA did not constitute a security within the meaning of 15 U.S.C. §§ 77b(1) and 78c(a)(10).

Subsequently, WVPA submitted a motion to file a second amended complaint, which was granted by this Court on January 27, 1986. WVPA's second amended complaint was filed on January 31, 1986, added alleged violations of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. § 1962(c) & (d), and named the following additional defendants:

1. Hugh A. Barker (Chairman, Director, and Chief Executive Officer of PSI);
2. Darrell V. Menscher (President, Director, and Chief Operating Officer of PSI);
3. William M. Petro (Vice President—Nuclear Services for PSI);
4. Vernley R. Rehnstrom (Senior Vice President—Finance for PSI);
5. Seth W. Shields (Senior Vice President—Nuclear Division for PSI);
6. Sargent & Lundy Engineers;
7. Management Analysis Company;
8. Gust K. Newberg, Inc.;
9. Gust K. Newberg Construction Company;
10. Donald L. Stegemoller (Newberg Vice President); and
11. Francis W. Durocher (Newberg Executive Vice President).

On March 17, 1986, defendants PSI, Barker, Menscher, Petro, Rehnstrom, and Shields (hereinafter "PSI defendants") filed their motion to dismiss the second amended complaint and to strike. This motion incorporates by reference PSI's prior motion for summary judgment deemed by this Court to be a motion for partial summary judgment on behalf of all the PSI defendants.

The present controversy revolves around an agreement to construct and operate Marble Hill, the eventual abandonment of the Project after it was partially constructed, and the course of dealings between PSI and WVPA between those two events. Apparently sometime during the early 1970's, PSI decided to construct the Marble Hill facility. This facility was to consist of two nuclear-powered generating units. Thereafter, PSI contacted several municipal and public utilities, including WVPA, concerning participation in the Project.

Initially, WVPA agreed to purchase a seven percent (7%) interest in Marble Hill. In addition, Northern Indiana Public Service Co. (hereinafter "NIPSCO") and East Kentucky Power Cooperative (hereinafter "EKPC") agreed to purchase a twenty percent (20%) and an eight percent (8%) share, respectively, in the Project. Subsequently, for reasons not disclosed to this Court, both NIPSCO and EKPC decided to terminate their involvement in the Project. WVPA, however, agreed to purchase an additional ten percent (10%) interest in Marble Hill. Thus, WVPA's total ownership interest in the Project was seventeen percent (17%). The remaining eighty-three percent (83%) interest in Marble Hill was retained by PSI. On February 1, 1978, PSI and WVPA executed two contracts: (1) the Marble Hill Nuclear Plant Purchase and Ownership Participation Agreement (hereinafter "POPA") and (2) the Marble Hill Nuclear Plant Operation and Maintenance Agreement (hereinafter "POMA"). These contracts, which will be explained in greater detail later in this Entry, contain provisions relating to the construction, operation, and ownership of Marble Hill.

At the time WVPA agreed to participate in the Project, PSI provided WVPA with estimates relating to construction costs and completion dates. PSI's original estimate of the total construction costs was $1.5 billion. In addition, PSI estimated "the first unit to be in commercial operation about January, 1982, and the second unit to be in commercial operation about January, 1984." Although the record is silent on when construction at Marble Hill began, the Nuclear Regulatory Commission (hereinafter "NRC") issued a stop-work order on August 15, 1979 that directed PSI to terminate certain safety-related construction at Marble Hill. On May 15, 1980, the NRC issued a second order that provided for the gradual recission of its stop-work order. The NRC's stop-work order was terminated on February 22, 1982. During this period, however, PSI revised its prior estimates. The estimated total construction costs were increased to $3.4 billion. In addition, the estimated commercial operation dates for the two units were delayed until December, 1986 and December, 1987.

Unfortunately, this does not end the saga of misfortune at Marble Hill. During the three and one-half (3½) year period from July 1980 to January, 1984, PSI repeatedly revised its cost estimates upward and its completion estimates outward. Eventually, total construction costs were estimated at $7 billion and commercial operation dates for the two units were estimated at December, 1988 and June, 1990. This represents a total cost increase of $5.5 billion and a delay of six (6) years. Moreover, the NRC issued a second safety-related stop-work order on January 27, 1983. Finally, on January 16, 1984, PSI notified WVPA that PSI had decided to abandon the Project.

WVPA's complaint asserts that the PSI defendants failed to disclose and misrepresented material facts relating to the status of the Project during the period from July 16, 1980 until January 16, 1984. Some of the alleged non-disclosures and misrepresentations include the following:

1. The PSI defendants did not disclose that it knew the estimated construction costs would rise above $3.4 billion.

2. The PSI defendants failed to disclose its financial inability to complete Marble Hill.

3. The PSI defendants misrepresented construction progress by:

A. Using non-critical factors to evaluate and measure project percentage completion figures;

B. Excluded known rework time from the contractors' reported productivity rates; and

C. Mismanaged its contract incentive programs by paying contractors for work which was not completed and which was performed out of sequence.

4. The PSI defendants failed to disclose or misrepresented the magnitude of construction problems of Marble Hill, including overstressed structural steel beams and connectors.

5. The PSI defendants failed to disclose that it had waived its right to cancel a nuclear fuel contract with Union Oil Company and that the onerous terms of the contract seriously jeopardized the commercial feasibility of Marble Hill.

As a result of the alleged misconduct, WVPA contends that it was induced to continue its participation in the Project. In addition, WVPA claims that the PSI defendants used the means and instrumentalities of interstate commerce, including interstate telephone facilities and the United States mails. WVPA concludes that the PSI defendants' conduct violates the anti-fraud provisions of the federal securities laws and constitutes racketeering activity premised upon mail fraud and wire fraud. In response, the PSI defendants argue that (1) WVPA has failed to allege fraud with the particularity required by Fed.R.Civ.P. 9(b), (2) WVPA has failed to allege a "pattern of racketeering activity," and (3) the contracts executed by PSI and WVPA do not constitute an "investment contract."

### I. MOTION TO STRIKE

■ As a preliminary matter, the PSI defendants have moved this Court, pursuant to Fed.R.Civ.P. 12(f), to strike those portions of the plaintiff's complaint relating to fraudulent concealment. This motion is premised upon a lack of particularity under Fed.R.Civ.P. 9(b). On April 4, 1986, this Court denied PSI's prior motion to strike plaintiff's second amended complaint. This Court declines to entertain a collateral attack on its prior order. This is particularly true where the motion to strike goes to the sufficiency of WVPA's complaint. As the court in *Cash v. Frederick & Co.*, 57 F.R.D. 71, 78 (E.D.Wis.1972) stated: "[A] 12(f) motion to strike is not the proper procedure to place plaintiff's pleadings in issue." *See also Armstrong v. Snyder*, 103 F.R.D. 96 (E.D.Wis.1984); 4 C. Wright and A. Miller, *Federal Practice and Procedure* § 1380 (1970). Consequently, this Court denies the PSI defendants' motion to strike.

### II. MOTION TO DISMISS

■ Next, the PSI defendants seek dismissal of that portion of WVPA's complaint alleging violations of RICO. For the purposes of this motion, this Court will accept as true the well pleaded facts contained in WVPA's complaint. First, the PSI defendants assert that WVPA's complaint lacks the specificity required by Fed.R.Civ.P. 9(b).[1] Rule 9(b) states in part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Nevertheless, it is established law in this circuit that Rule 9 must be read in conjunction with Rule 8. *Tomera v. Galt*, 511 F.2d 504 (7th Cir.1975). As the court in *Tomera* stated:

Rule 8 requires that a plaintiff give through his pleadings notice to the defendant of the nature of his claims.... It urges the plaintiff to make known his

---

**1.** This Court's research reveals that it has become standard practice for RICO defendants to allege lack of specificity. This Court takes a dim view of this litigation strategy because it tends to delay, rather than enhance, resolution of a RICO claim. For example, in this case PSI filed an answer to WVPA's original complaint. When WVPA amended its complaint to add its RICO claim, WVPA incorporated its prior allegations into its RICO claim. Suddenly, however, the PSI defendants were unable to answer because of a lack of specificity.

claims simply and concisely in short, plain statements. With these principles in mind, the purpose of Rule 9 becomes clear. Rule 9 lists the actions in which *slightly more* is needed for notice. *Id.* at 508 (emphasis added). In applying this standard to a "RICO claim predicated on mail or wire fraud [the plaintiff] must sketch out both the scheme to defraud and how the mail or wires furthered that scheme." *Bieganek v. Wilson,* 642 F.Supp. 768, 771 (N.D.Ill.1986), *vacated on other grounds,* 801 F.2d 879 (7th Cir.1986). Thus, the plaintiff must sketch out *"who* caused *what* to be placed in the mails *in furtherance* of the alleged scheme to defraud and *when* such mailing was made." *Harris Trust & Savings Bank v. Ellis,* 609 F.Supp. 1118, 1123 (N.D.Ill.1985) (original emphasis); *see also Ghouth v. Conticommodity Services, Inc.,* 642 F.Supp. 1325 (N.D.Ill.1986); *Bieganek,* 642 F.Supp. at 770–771. Moreover, the paragraphs in a complaint should not be read in isolation. *Ghouth,* 642 F.Supp. at 1332. Finally, "where a transaction is more complex or the transactions are numerous and take place over an extended period of time, less specificity is required." *Ambrosino v. Rodman & Renshaw, Inc.,* 635 F.Supp. 968, 971 (N.D.Ill.1986).

Applying the foregoing to plaintiff's complaint, this Court concludes that WVPA has satisfied the requirement of Rule 9. The plaintiff alleges a scheme by PSI and its officers and directors to defraud WVPA. In furtherance of the alleged scheme, WVPA contends that the PSI defendants sent numerous letters, invoices, checks, bills, and reports on a monthly basis to WVPA. Moreover, the plaintiff alleges that this conduct occurred over the span of approximately three and one-half (3½) years. Thus the plaintiff has alleged who mailed what and when. Furthermore, specific allegations about the acts of a group member are not required where the defendants are "identified as officers and/or directors, and the alleged misrepresentations and omissions were in documents like annual reports and financial statements that entail the collective actions of the officers and/or directors." *In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583, 593 (E.D.Mich.1985) (citing *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y.1983)). Consequently, the PSI defendants' argument based upon lack of particularity is without merit.

The PSI defendants, however, also contend that WVPA has failed to allege a pattern of racketeering activity. The PSI defendants argue that the pattern requirement is not satisfied when the plaintiff alleges only a single scheme to defraud. In contrast, WVPA contends it has satisfied the pattern requirement because it has alleged multiple indictable offenses constituting mail or wire fraud. In a series of recent cases, the Seventh Circuit Court of Appeals has rejected the positions advocated by both PSI and WVPA; instead, the court has adopted an intermediate approach. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987); *Appley v. West,* 832 F.2d 1021 (7th Cir.1987); *Tellis v. United States Fidelity & Guaranty Co.,* 826 F.2d 477 (7th Cir.1987); *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806 (7th Cir.1987); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810 (7th Cir.1987); *Marks v. Pannell Kerr Forster,* 811 F.2d 1108 (7th Cir. 1987); *Elliot v. Chicago Motor Club Insurance,* 809 F.2d 347 (7th Cir.1986); *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986); *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322 (7th Cir.1986).

Under 18 U.S.C. § 1961(1), "racketeering activity" encompasses mail fraud and wire fraud. Moreover, a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). In *Lipin* the court stated: "In general, however, much more than two such acts must be shown in order to demonstrate a pattern. The separate racketeering acts must reflect both 'continuity' and 'relatedness' in order to constitute a pattern." *Lipin,* 803 F.2d at 323 (citations omitted).

In its subsequent opinion in *Morgan*, the court further discussed the concept of a "pattern." Initially, the court cautioned against focusing excessively on either the "continuity" or "relationship" prongs of the pattern requirement. *Morgan*, 804 F.2d at 975. Instead, the courts were instructed to consider a number of factors in determining whether the predicate acts were "ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions...." *Id.* The relevant factors include the following:

1. the number and variety of predicate acts;
2. the length of time over which the predicate acts were committed;
3. the number of victims;
4. the presence of separate schemes; and
5. the occurrence of distinct injuries.

*Id.* The court, however, also emphasized that no one factor was determinative. *Id.* at 976.

In *Morgan*, the Seventh Circuit found that various acts of mail fraud over a four year period that allegedly induced plaintiff to invest in a venture, induced plaintiff to guarantee loans, and then twice furthered allegedly fraudulent foreclosure sales were enough to constitute a pattern under RICO. *Id.* at 976. In several cases after *Morgan*, the Seventh Circuit clarified, however, that numerous predicate acts that all relate to a single transaction are not sufficient to constitute a pattern of racketeering activity. *See Tellis*, 826 F.2d at 477; *Skycom*, 813 F.2d at 810; *Marks*, 811 F.2d at 1108; *Elliot*, 809 F.2d at 347.

*Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987) is the Seventh Circuit's most recent analysis of the RICO pattern requirement. In that case, the defendant leased compressed gas cylinders from the plaintiff. Upon termination of its distributorship with the plaintiff, the defendant was required to return the cylinders, unless it paid rent on them or paid the replacement value of the cylinders. Unfortunately, the defendant did none of these things. Rather, the defendant convinced an employee of the plaintiff to prepare nineteen falsified shipping orders, which indicated that the cylinders had been returned. The court stated: "Each time an invoice was falsely prepared, it deprived Liquid Air of its entitlement to rent or replacement value. Therefore, each act resulted in a distinct injury to Liquid Air and a concommitant benefit to [the defendant]." *Id.* at 1304–05. It then held "that the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO." *Id.* at 1305 (citation omitted).

In the present case, WVPA has alleged a single (albeit lengthy and complex) scheme with but a single victim, WVPA. However, the Seventh Circuit has noted that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Morgan*, 804 F.2d at 975–76; *see also Liquid Air*, 834 F.2d at 1304.

WVPA has further alleged that once it agreed in 1978 to partially finance Marble Hill, defendants committed numerous acts of mail and wire fraud over the next several years to conceal the true extent of construction delays and financial difficulties and to induce WVPA's continued participation in the Project. WVPA specifically alleges, in paragraph 29 of its complaint, that it borrowed additional funds from R.E. A. in 1980 to finance its share of the venture and, in paragraph 43, that it was induced to pay an additional $10 million just before the Project was abandoned. Thus plaintiff alleges numerous predicate acts over a prolonged period and repeated economic injuries.

Comparing these allegations to those found by the Seventh Circuit to constitute a RICO "pattern," the Court finds that here, as in *Morgan*, 804 F.2d at 970, plaintiff alleges an initial business transaction followed by several fraudulent acts focused on maintaining plaintiff's participation in the venture. Here, as in *Liquid Air*, 834 F.2d at 1304–05, although there was one ongoing agreement between the parties,

plaintiff allegedly incurred repeated economic injuries. Finally, applying the *Morgan* factors to this case, the Court finds that although there was only one scheme and one victim, WVPA's allegations of numerous predicate acts over a period of several years and repeated economic injuries are sufficient to withstand a motion to dismiss for failure to allege a pattern of racketeering activity. Accordingly, PSI's motion to dismiss the RICO claims must be denied.

### III. MOTION FOR PARTIAL SUMMARY JUDGMENT

Finally, the PSI defendants seek partial summary judgment on the basis that the contracts executed by PSI and WVPA do not constitute a security within the meaning of 15 U.S.C. §§ 77b(1) and 78c(a)(10).[2] The parties have submitted supporting affidavits. Initially, this Court observes that Fed.R.Civ.P. 56(b) permits a motion for partial summary judgment as to any part of a claim made against a party. Moreover, summary judgment should be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "[T]he party seeking summary judgment bears the burden of persuading the court that no issue of material fact exists." *Janowiak v. Corporate City of South Bend,* 750 F.2d 557, 559 (7th Cir. 1984); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Finally, "the court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment." *Janowiak,* 750 F.2d at 559.

To assess properly the PSI defendants' motion for partial summary judgment, it is necessary to discuss at some length the provisions of the contracts executed by PSI and WVPA. The relevant provisions of the POPA indicate that PSI would own an eighty-three percent (83%) undivided interest and WVPA a seventeen percent (17%)

undivided interest in the Project as tenants in common. Under the contract, PSI and WVPA were entitled to eighty-three percent (83%) and seventeen percent (17%), respectively, of the capability, net energy output, and any other benefits derived from the Project. Similarly, PSI and WVPA agreed to share the risk of loss, costs, obligations, and liabilities in accordance with their ownership interests. Upon written notice, both PSI and WVPA had the right to assign, transfer, convey, or sell all or part of their respective interests in the Project, subject to the right of first refusal to purchase by the other party. In addition, the POPA expressly indicates that PSI was to "have sole responsibility for, and is fully authorized to act for the Parties with respect to the design, engineering, licensing, procurement, installation, and other matters relating to the construction of the Project and for any modifications or additions made to the Project." Nevertheless, PSI was also required to inform WVPA of any "significant decisions" relating to construction modifications or alterations and, upon request, WVPA was entitled to consult with PSI regarding these significant decisions. The POPA also required the creation of an Administrative Committee, which was to consist of one representative from PSI and one representative from WVPA. The Administrative Committee's primary responsibilities were to provide liaison between the parties and to review and discuss disputes and significant matters arising under the contracts executed by PSI and WVPA.

The POMA contains similar provisions. For example, under the POMA, PSI was entitled to eighty-three percent (83%) and WVPA was entitled to seventeen percent (17%) of the Project's net energy output. Moreover, PSI and WVPA were responsible for the operation and maintenance costs, including the cost of nuclear fuel, of the Project in accordance with their respective ownership interests. Both PSI and

---

**2.** Although the definitions contained in these two statutes are slightly different, the Supreme Court has indicated that "the coverage of the two Acts may be considered the same." *United*

*Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

WVPA were entitled to dispose of their proportionate shares of the capacity and energy generated by the Project through scheduled transactions and PSI could "not refuse any reasonable scheduled transaction for WVPA." Again, the POMA expressly indicates that PSI was "responsible for the management, control, maintenance, and operation of the Project...." Finally, WVPA's authorized representatives had a right of access to Marble Hill at all reasonable times.

The sole issue confronting this Court on the defendant's motion for partial summary judgment is whether or not the contracts executed by PSI and WVPA constitute an "investment contract" as a matter of law. Obviously, the analysis of a purported investment contract must begin with the Supreme Court's opinion in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey*, the court stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298–99, 66 S.Ct. at 1102–03. Thus, "an investment contract consists of (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others." *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir.1984). The courts,

however, repeatedly emphasize that this test must be applied in light of the economic realities of the transactions. *See, e.g., United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96 (7th Cir.1977). Thus, this Court's focus is on the substance, not the form, of the transaction.[3]

Initially, this Court observes that the contracts between PSI and WVPA satisfy the first prong of the *Howey* test. Clearly the funds transferred by WVPA to PSI under the contracts constitute an investment of money. Moreover, WVPA and PSI entered into a common enterprise, however unequal their rights in the venture were.

In this Circuit, the existence of a common enterprise is dependent upon "horizontal commonality." Under this test, "multiple investors must pool their investments and receive pro rata profits." *Stenger*, 741 F.2d at 146. For example, in *Stenger* the plaintiff approached an art dealer "with the intent of investing money in a safe, liquid commodity." *Id.* at 145. Thereafter, the plaintiff purchased twelve paintings from the defendant, who "promised to create a market for plaintiff's paintings and would, if plaintiff wished, resell the paintings." *Id.* The court concluded that there was no horizontal commonality because the complaint did not set "forth a pooling of funds or sharing of profits with other investors." *Id.* at 147.

In the present case, the contracts establish that there was a pooling of funds for the construction and anticipated operation of the Project. In addition, WVPA and PSI were entitled to sell their interests in the

---

**3.** In the present case, the parties have attempted to characterize their contractual relationship as either a joint venture or a limited partnership. The difficulties associated with "labeling" a transaction, however, are readily apparent in this case. For example, WVPA contends that it is a limited partner in Marble Hill. Nevertheless, there is nothing in the record to indicate that WVPA and PSI filed a limited partnership certificate with the State of Indiana. *See Ind. Code Anno.* § 23–4–2–2 (Burns 1984). Moreover, the POPA unambiguously states "that nothing herein shall ever be construed to create an association, trust or partnership...."

Similarly, PSI claims that its relationship with WVPA constitutes a joint venture. Nonetheless, a joint venture is by definition a profit-seeking enterprise. *See Boyer v. First National Bank of Kokomo*, 476 N.E.2d 895 (Ind.Ct.App.1985). To a certain extent, this conflicts with PSI's assertion that WVPA did not enter into the transaction with an expectation of profit. Nevertheless, because this Court's focus is on the substance of the transaction, it is unnecessary to append a specific label to the contractual relationship between PSI and WVPA.

physical plant, capability, and net energy output of Marble Hill. Consequently, this Court finds as a matter of law that there was a common enterprise within the meaning of the *Howey* test.

■ Nevertheless, this Court concludes that the transaction between WVPA and PSI does not satisfy the third prong of the *Howey* test. As noted previously, this prong requires an "expectation of profits produced solely by the efforts of others." In determining whether there is an expectation of profits, the courts generally consider the following factors: (1) the promotional emphasis of the developer and (2) the motivation of the purchaser. *See, e.g., S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (promotional emphasis); *Forman*, 421 U.S. at 852–53, 95 S.Ct. at 2060–61 (purchaser's motivation). Despite the voluminous pleadings submitted by the parties, there is very little in the record relating to PSI's promotional activities. For example, WVPA submitted three letters from PSI to WVPA concerning participation in Marble Hill. Although the letters contain some reference to the economic benefits of Marble Hill, the primary focus of the letters is on joint participation in the Project and the costs of the Project. Thus, the evidence relating to PSI's promotional efforts provides little support for WVPA's assertion of an expectation of profits.

■ Nevertheless, this Court must also consider WVPA's motivation for entering into the Project. As a preliminary matter, however, this Court needs to address an issue raised by PSI. Essentially, PSI contends that the Indiana Utility Regulatory Commission in granting WVPA a certificate of authority determined that WVPA's purpose for participating in Marble Hill was to serve as a power supplier to its member systems. Thus, PSI argues that this Court should conclude that WVPA did not have an investment purpose on the basis of collateral estoppel.

In *University of Tennessee v. Elliot*, 478 U.S. 788, 106 S.Ct. 3220, 3227, 92 L.Ed.2d 635 (1986) (citation omitted), the Supreme Court held "that when a state agency 'act-ing in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." In Indiana, "decisions of administrative agencies ... are to be accorded collateral estoppel effect if the proceedings are judicial in nature...." *McClanahan v. Remington Freight Lines, Inc.*, 498 N.E.2d 1336, 1343 (Ind.Ct.App.1986). Nevertheless, Indiana's Utility Regulatory Commission "can exercise only administrative or legislative powers," it has "no judicial powers...." *Public Service Indiana, Inc. v. Nichols*, 494 N.E.2d 349, 353 (Ind.Ct.App.1986); *see also Indiana Bell Telephone Co. v. Friedland*, 175 Ind.App. 622, 373 N.E.2d 344 (1978) (rate making is legislative function). Thus, PSI's argument based upon collateral estoppel is without merit, because the Indiana Courts would not recognize collateral estoppel on these facts. However, the findings of the URC retain evidentiary significance. Clearly, a significant motivation of WVPA was to provide for the electrical energy needs of its members.

■ In assessing WVPA's expectation of profits, it is well established that the securities laws do not apply if the "purchaser is motivated by a desire to use or consume the item purchased...." *Forman*, 421 U.S. at 852–53, 95 S.Ct. at 2060–61. Under its contracts with PSI, WVPA was entitled to seventeen percent (17%) of Marble Hill's net energy output. The record, however, also indicates that forty percent (40%) of WVPA's allotted net energy output was dedicated to satisfying the energy requirements of WVPA's member systems. Thus, it is apparent that one of WVPA's significant motivations was its desire to use or consume a portion of the net energy output for its own purposes. This suggests that WVPA did not enter into the transaction with an expectation of profit.

Nevertheless, about sixty percent (60%) of WVPA's energy entitlement was available for disposition outside its members' requirements. When it entered into the

contracts with PSI, WVPA also negotiated a contract with NIPSCO. Under that contract, NIPSCO agreed to purchase ninety percent (90%) of WVPA's non-dedicated energy allotment. Further, the NIPSCO contract was reputedly a "cost plus" contract. Therefore, it appears that WVPA's motivation for entering into the Project was based upon both an expectation of profit and consumption.

The third prong of the *Howey* test, however, contains two elements. In addition to an expectation of profits, the *Howey* test speaks of profits to be derived *solely* from the efforts of others. Subsequent cases have softened this requirement. Thus, the courts conclude "that complete passivity is not required for an individual to be an investor." *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir.1986); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). As the court in *Frederiksen v. Poloway*, 637 F.2d 1147, 1153 (7th Cir.1981) (quoting *S.E.C. v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir.1973) stated:

> [T]he test for determining whether the reliance element has been met is "whether the efforts made by those other than the investor are the undeniably significant one, those essential managerial efforts which affect the failure or the success of the enterprise."

Often, the courts will analyze the reliance element of the *Howey* test in terms of the amount of control retained by the investor over the investment. *See Rodeo*, 787 F.2d at 1177–1178; *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). Regardless of the terminology employed by the courts in analyzing this aspect of the *Howey* test, it is clear that the courts will find a security is not present where the investor retains unfettered discretion over the distribution and marketing of the product.

For example, in *Kefalas v. Bonnie Brae Farms, Inc.*, 630 F.Supp. 6 (E.D.Ky.1985), the plaintiffs purchased fractional interests, in three thoroughbred stallions. Each fractional interest, deemed a "nomination," entitled the purchaser to breed a mare to a stallion. The fractional interests could be either used or sold by the purchaser. The plaintiffs, however, did not own any mares. Thus, they could only realize a profit by selling their nominations. In concluding that there was no investment contract, the court stated: "Selling these nominations would be the job of the owner, and any profits derived would necessarily depend on the skills and efforts of the owner rather than those of the syndicate manager." *Id.* at 8.

Similarly, the court in *Mosher v. Southridge Associates, Inc.*, 552 F.Supp. 1231, 1233 (W.D.Pa.1982) held that the purchase of a condominium was not an investment contract because:

> First, the purchaser of the condominium was not conditioned upon plaintiff's [sic] participation in any rental program. Second, the decision to rent or not to rent the condominium notwithstanding plaintiffs' avowed intent, was within plaintiffs' sole discretion, nor were the plaintiffs, in the event they decided to rent the property, bound by the sales agreement to use a particular rental agent to let the property. Third, the agreement between the parties does not contemplate the pooling of rental payments. To that end, plaintiffs' participation in the common enterprise was limited to the actual rental obtained from the rental of their own unit. Finally, there are no restrictions here that would limit plaintiffs' right to use their unit....

*See also SEC Securities Act Release No. 33–5347*, 38 Fed.Reg. 1735 (Jan. 18, 1973).

To this Court, any profit derived by WVPA from Marble Hill is primarily the product of two factors: (1) the production and (2) the marketing of its output, electrical energy. If one focuses solely on production, arguably profit does depend upon the efforts of PSI. Assuming that PSI had operated Marble Hill in an efficient manner, WVPA theoretically would have obtained energy at a cost that was less than or equal to the prevailing price of electricity in the wholesale market. In turn, this would enhance WVPA's ability to realize a

profit when it sold its non-dedicated energy allotment. Similarly, if WVPA chose to sell a portion of its undivided interest in Marble Hill, PSI's efficient management conceivably would enable WVPA to command a premium price.

Nevertheless, if one looks at the whole picture, the role of PSI is submerged. WVPA's skill at marketing was the major determinant to the question of profit *vel non.* If WVPA failed to properly market its energy allotment or undivided interest in Marble Hill, any anticipated profit would be reduced or eliminated. Conversely, efficient marketing could increase WVPA's expected profit. Furthermore, under the contracts WVPA retained the sole discretion to decide whether to sell and to whom to sell its proportionate share of Marble Hill's capacity and net energy output. In addition, WVPA had the discretion to determine the terms of any sale.[4] Similarly, the only restriction placed on WVPA's ability to transfer its undivided interest in the physical plant at Marble Hill was PSI's right of first refusal to purchase the interest. WVPA, however, had the discretion to negotiate the terms and conditions of a proposed sale and nothing in the contracts required WVPA to sell the interest to PSI on more favorable terms.

In this case, the efforts of PSI are not "the undeniably significant ones," because 40% of the deal is outside the profit motive (i.e. consumed by plaintiff's members) and, as to the remaining 60%, any profit that might be realized by WVPA depends primarily upon the skill and effort of WVPA, not PSI. Consequently, this Court concludes as a matter of law that WVPA did not have an expectation of profits produced solely by the efforts of others and the contracts executed by WVPA and PSI do not constitute a security. Therefore, PSI's motion for partial summary judgment on Count I of plaintiff's second amended complaint, alleging securities law violations, must be granted.

For the foregoing reasons, the motion of the PSI defendants for partial summary judgment on Count I is granted, and the PSI defendants' motions to strike and to dismiss are denied.

---

**4.** This Court recognizes that WVPA's discretion is not unlimited because it is subject to regulation by Indiana's Utility Regulatory Commis-sion. The limitation on WVPA's discretion, however is not imposed by its contracts with PSI.